Paul J. Zidlicky (*pro hac vice* pending)
pzidlicky@sidley.com
Eric D. McArthur (*pro hac vice* pending)
emcarthur@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711

Sean A. Commons, SBN 217603
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Tel: (213) 896-6000
Fax: (213) 896-6600

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTH AMERICAN MEAT INSTITUTE, <br><br> Plaintiff, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and SUSAN FANELLI, in her official capacity as Acting Director of the California Department of Public Health, <br><br> Defendants. | Case No. 2:19-cv-08569-CAS (FFMx) <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** <br><br> The Honorable Christina A. Snyder <br><br> Date: November 18, 2019 <br> Time: 10:00 a.m. <br> Location: Courtroom 8D <br><br> Complaint filed: October 4, 2019 <br><br> [Filed Concurrently with Declaration of Casey Lynn Gallimore; Declaration of Dr. Keith E. Belk; Declaration of Dale Bakke; Declaration of Anthony Catelli, Jr.; Declaration of Brian Friesen; Declaration of Cory Bollum; Declaration of Robert Darrell; Declaration of Todd Neff; Declaration of Joshua L. Rennells; Declaration of Matthew Turner] |

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 18, 2019 at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 8D of the First Street Courthouse, located at 350 W. First Street, Los Angeles, California 90012, plaintiff North American Meat Institute (the "Meat Institute") will and hereby does move for a preliminary injunction enjoining the implementation and enforcement of Proposition 12's sales ban, California Health & Safety Code § 25990(b), as applied to pork and veal imported into California from other States and countries.

The motion for preliminary injunction is made on these grounds:

(1)     Plaintiff is likely to prevail on the merits because Proposition 12's sales ban violates the Commerce Clause of the U.S. Constitution and principles of interstate federalism in three respects. First, it is a protectionist trade barrier that shields California producers from out-of-state competition by leveling the regulatory playing field, and it cannot be justified under the exacting scrutiny applicable to discriminatory laws. Second, it improperly regulates extraterritorial commerce by dictating farming practices in other States and countries upon pain of exclusion from the California market. Third, it substantially burdens interstate commerce in pork and veal, while serving no legitimate local interest.

(2)     The Meat Institute's members will suffer severe irreparable harm if Proposition 12's sales ban is not preliminarily enjoined. The sales ban puts the Meat Institute's members to a Hobson's choice: either comply with Proposition 12 at substantial expense or be forced from the California market. Either way, the Meat Institute's members will incur substantial unrecoverable costs and suffer irreparable harms absent an injunction.

(3)     The public interest and the equities favor a preliminary injunction. Both factors require compliance with the Constitution. And because Proposition 12's sales ban does not advance any legitimate local interest in either the welfare of animals in California or the health and safety of California consumers, a preliminary injunction would not harm California. The balance of hardships therefore tips sharply in the Meat Institute's favor.

The motion is based on this notice of motion, the memorandum of points and author-ities, all other papers on file, and the argument of counsel at the hearing of this motion. Accompanying this motion are supporting declarations from the following individuals:

- Casey Lynn Gallimore, Director of Regulatory and Scientific Affairs, North American Meat Institute ("Gallimore Decl.")

- Dr. Keith E. Belk, Professor and Head of the Department of Animal Sciences, Colorado State University ("Belk Decl.")

- Dale Bakke, President, American Veal Association ("Bakke Decl.")

- Anthony Catelli, Jr., President/CEO, Catelli Brothers, Inc. ("Catelli Decl.")

- Brian Friesen, President, Marcho Farms, Inc. ("Friesen Decl.")

- Cory Bollum, Director of Pork Operations and Procurement, Hormel Foods Corporation ("Bollum Decl.")

- Robert Darrell, Vice President of Retail Fresh Pork Sales, Smithfield Foods, Inc. ("Darrell Decl.")

- Todd Neff, Senior Vice President, Tyson Fresh Meats, Inc. ("Neff Decl.")

- Joshua L. Rennells, CFO, Clemens Food Group, LLC ("Rennells Decl.")

- Matthew Turner, Head of Live Production Operations, JBS USA ("Turner Decl.")

DATED: October 4, 2019          SIDLEY AUSTIN LLP


                                */s/ Sean A. Commons*
                                Paul J. Zidlicky (*pro hac vice* pending)
                                Eric D. McArthur (*pro hac vice* pending)
                                SIDLEY AUSTIN LLP
                                1501 K Street NW
                                Washington, DC 20005
                                Tel: (202) 736-8000
                                Fax: (202) 736-8711

                                Sean A. Commons, SBN 217603
                                SIDLEY AUSTIN LLP
                                555 West Fifth Street, Suite 4000
                                Los Angeles, CA 90013

1

2

Tel: (213) 896-6000
Fax: (213) 896-6600

*Attorneys for Plaintiff*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

BACKGROUND ...............................................................................................2

      A.     Proposition 2 and Assembly Bill 1437...................................................2

      B.     Proposition 12.......................................................................................3

      C.     Implementing Regulations ...................................................................5

      D.     This Lawsuit ........................................................................................5

ARGUMENT .....................................................................................................5

I.     The Meat Institute Is Likely To Prevail On The Merits...................................6

      A.     Proposition 12's Sales Ban Is A Protectionist Trade Barrier................7

      B.     Proposition 12's Sales Ban Regulates Extraterritorial Commerce .....15

      C.     Proposition 12's Sales Ban Excessively Burdens Interstate Commerce ...........................................................................................19

II.    Proposition 12 Will Irreparably Harm The Meat Institute's Members.........23

III.   The Equities And The Public Interest Favor Preliminary Injunctive Relief...........................................................................................................25

CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ........................................................5

*Am. Fuel & Petrochemical Mfrs. v. O'Keefe,*
  903 F.3d 903 (9th Cir. 2018), *cert. denied,* 139 S. Ct. 2043 (2019) .................17

*Am. Trucking Ass'ns, Inc. v. City of L.A.,*
  559 F.3d 1046 (9th Cir. 2009) ........................................................23

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
  729 F.3d 937 (9th Cir. 2013) .......................................9, 10, 18, 19, 22

*Ass'n for Accessible Meds. v. Frosh,*
  887 F.3d 664 (4th Cir. 2018), *cert. denied,* 139 S. Ct. 1168 (2019) .................16

*Bacchus Imports Ltd. v. Dias,*
  468 U.S. 263 (1984)...............................................................6, 10

*Baldwin v. G.A.F. Seelig, Inc.,*
  294 U.S. 511 (1935)..............................................................*passim*

*BMW of N. Am., Inc. v. Gore,*
  517 U.S. 559 (1996)................................................................15

*Bonaparte v. Tax Court,*
  104 U.S. 592 (1882)............................................................11, 15

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
  476 U.S. 573 (1986)..............................................................9, 16

*C&A Carbone, Inc. v. Town of Clarkstown,*
  511 U.S. 383 (1994).............................................................*passim*

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
  563 F.3d 847 (9th Cir. 2009), *vacated on other grounds by Douglas v.*
  *Indep. Living Ctr. of S. Cal., Inc.,* 565 U.S. 606 (2012)...............................23, 25

*City of Phila. v. New Jersey,*
  437 U.S. 617 (1978)..................................................................9

ii

*Cloverland-Green Spring Dairies, Inc. v. Penn. Milk Mktg. Bd.*,
298 F.3d 201 (3d Cir. 2002) ......................................................8, 9, 10

*Compassion Over Killing v. FDA*,
849 F.3d 849 (9th Cir. 2017) ...............................................................12

*Daniels Sharpsmart, Inc. v. Smith*,
889 F.3d 608 (9th Cir. 2018) ............................................5, 7, 16, 18

*Dep't of Revenue v. Davis*,
553 U.S. 328 (2008)...............................................................................7

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ............................................................25

*Duncan v. Becerra*,
366 F. Supp. 3d 1131 (S.D. Cal. 2019), *appeal docketed*, No. 19-55376
(9th Cir. Apr. 4, 2019) .........................................................................22

*Energy & Envt. Legal Inst. v. Epel*,
793 F.3d 1169 (10th Cir. 2015) ..........................................................18

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
504 U.S. 353 (1992)..............................................................................14

*Great Atl. & Pac. Tea Co. v. Cottrell*,
424 U.S. 366 (1976)..............................................................................14

*Healy v. Beer Inst.*,
491 U.S. 324 (1989).....................................................1, 6, 7, 15, 19

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ............................................................23

*hiQ Labs, Inc. v. LinkedIn Corp.*,
No. 17-16783, 2019 WL 4251889 (9th Cir. Sept. 9, 2019).................25

*Hughes v. Alexandria Scrap Corp.*,
426 U.S. 794 (1976)..............................................................................21

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)......................................................1, 6, 8, 10

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES

*H.P. Hood & Sons, Inc. v. DuMond*,
  336 U.S. 525 (1949)......................................................................9

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) ........................................................8

*Kassel v. Consol. Freightways Corp. of Del.*,
  450 U.S. 662 (1981)...............................................7, 13, 14, 20, 21

*Missouri ex rel. Koster v. Harris*,
  847 F.3d 646 (9th Cir. 2017) .....................................................3, 9

*Legato Vapors, LLC v. Cook*,
  847 F.3d 825 (7th Cir. 2017) ..........................................16, 17, 19

*Lewis v. BT Inv. Managers, Inc.*,
  447 U.S. 27 (1980)......................................................................11

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .......................................................23

*Missouri v. California*,
  No. 22O148 (U.S. filed Dec. 7, 2017) ..........................................3

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012) ...............................................20, 22

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade
  Council*, 530 U.S. 363 (2000) ....................................................16

*Nat'l Meat Ass'n v. Deukmejian*,
  743 F.2d 656 (9th Cir. 1984), *aff'd*, 469 U.S. 1100 (1985)...............1

*Nat'l Meat Ass'n v. Harris*,
  565 U.S. 452 (2012).....................................................................13

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,
  165 F.3d 1151 (7th Cir. 1999) ....................................................16

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,
  63 F.3d 652 (7th Cir. 1995) ...................................................16, 18

*NCAA v. Miller*,
    10 F.3d 633 (9th Cir. 1993) ....................................................................7, 16, 18

*New Energy Co. of Ind. v. Limbach*,
    486 U.S. 269 (1988)..............................................................................6, 11

*Nken v. Holder*,
    556 U.S. 418 (2009)....................................................................................25

*North Dakota v. Heydinger*,
    825 F.3d 912 (8th Cir. 2016) .........................................................................16

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*,
    511 U.S. 93 (1994)....................................................................................6, 14

*Pac. Nw. Venison Producers v. Smitch*,
    20 F.3d 1008 (9th Cir. 1994) ........................................................................22

*People v. Rose*,
    No. H038704, 2014 WL 4947314 (Cal. Ct. App. Oct. 2, 2014) ......................11

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)..........................................................................2, 7, 19, 20

*Raymond Motor Transp., Inc. v. Rice*,
    434 U.S. 429 (1978)..........................................................................7, 13, 21

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) .................................................................17, 18

*Rocky Mountain Farmers Union v. Corey*,
    913 F.3d 940 (9th Cir. 2019) ...................................................................17, 18

*Sam Francis Found. v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) ..........................................................1, 7, 16, 18

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    139 S. Ct. 2449 (2019)...................................................................1, 6, 7

*Union Pac. R.R. v. Cal. Pub. Utils. Comm'n*,
    346 F.3d 851 (9th Cir. 2003) ..........................................................................19

v

*United States v. Manning*,
    434 F. Supp. 2d 988 (E.D. Wash. 2006), *aff'd*, 527 F.3d 828 (9th Cir.
    2008) ...................................................................................................22

*W. Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994)................................................................1, 6, 7, 8, 9

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992)..............................................................................9

*Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*,
    731 F.3d 843 (9th Cir. 2013) ..............................................................22

**Constitution and Statutes**

U.S. Const. art. I, § 8, cl. 3 ........................................................................6

Federal Meat Inspection Act (21 U.S.C. § 601 *et seq.*) ...........................13

Cal. Health & Safety Code § 25990.......................................3, 4, 12, 13

Cal. Health & Safety Code § 25991.....................................3, 4, 5, 13, 14

Cal. Health & Safety Code § 25992.........................................4, 12, 14

Cal. Health & Safety Code § 25993.............................................4, 5

Cal. Health & Safety Code § 25996.............................................3

Cal. Health & Safety Code § 114035 ..........................................14

Prevention of Cruelty to Farm Animals Act, Prop. 12 ...............................3

**Legislative Material**

Cal. Assembly Comm. on Agriculture, Bill Analysis of AB 1437 (May 13,
    2009) ...................................................................................................3, 8

Prevention of Farm Animal Cruelty Act, 2016 Mass. Acts 1052............19

**Other Authorities**

Renee Johnson, Congressional Research Service, *The Federal Food Safety
    System: A Primer* (2016)....................................................................13

Prop. 2, Official Voter's Information Guide...........................................11

vi

USDA, National Agricultural Statistics Service, *Livestock Slaughter* (Apr. 2019) .............................................................................................................22

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES

## MEMORANDUM OF POINTS AND AUTHORITIES

This case is about whether California can insulate its farmers from out-of-state competition and project its agricultural regulations beyond its borders by banning the sale of wholesome meats imported into California unless farmers in other States and countries comply with the animal confinement requirements California voters adopted in Proposition 12. Under longstanding Supreme Court precedent, the answer to that question is no. Because the Meat Institute's constitutional challenge is likely to prevail, and because its members will suffer severe irreparable harm absent preliminary injunctive relief, this Court should preliminarily enjoin Proposition 12's sales ban.

The Meat Institute is likely to prevail on the merits because Proposition 12's sales ban violates the Commerce Clause and interstate federalism in three respects. *First*, it erects a protectionist trade barrier whose purpose and effect are to shield California producers from out-of-state competition. The sales ban's purpose is to "level the playing field" between California producers and out-of-state producers, and it does so by stripping away the competitive advantage out-of-state producers would have if they could sell their products in California without complying with the costly confinement requirements that apply directly to California producers under Proposition 12. This protectionism violates the Commerce Clause and cannot survive strict scrutiny. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459–61 (2019); *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192–97 (1994); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–53 (1977); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521–28 (1935); *Nat'l Meat Ass'n v. Deukmejian*, 743 F.2d 656, 659–60 (9th Cir. 1984), *aff'd*, 469 US. 1100 (1985).

*Second*, Proposition 12's sales ban violates the prohibition on extraterritorial state regulation. *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323–25 (9th Cir. 2015) (en banc). California lacks power to regulate farming practices outside California, and it cannot condition access to its market as a means to control how farm animals are confined in other States and countries. As the Supreme Court has made clear, "States and localities may not attach restrictions to exports or

1

imports in order to control commerce in other States." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393 (1994). That is precisely what Proposition 12's sales ban does—it projects California law worldwide by banning the in-state sale of wholesome meats imported from other States and countries unless out-of-state producers comply with California's farm animal confinement requirements outside of California.

*Third*, Proposition 12's sales ban imposes substantial burdens on interstate commerce that vastly exceed any local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). It imposes requirements far beyond current industry standards, requiring producers either to spend millions of dollars building California-compliant facilities and/or slash output, or to abandon the California market. The resulting burdens, which will be borne primarily by out-of-state businesses, are not justified by any legitimate local interest.

Absent an injunction, Proposition 12 will cause Meat Institute members immediate and irreparable harm. Proposition 12 puts regulated parties to a Hobson's choice: (i) expend millions of dollars to comply with an unconstitutional statute or (ii) be driven from the California market and lose revenue and hard-earned customer goodwill. Neither category of harm can be remedied post-trial. And because a preliminary injunction would not harm California, the balance of equities and public interest tip sharply in favor of an injunction.

## BACKGROUND

### A.   Proposition 2 and Assembly Bill 1437

In November 2008, California voters enacted Proposition 2, a ballot initiative entitled the Prevention of Farm Animal Cruelty Act, to "prohibit the cruel confinement of farm animals." Effective January 1, 2015, Proposition 2 prohibited California farmers from confining pregnant pigs, veal calves, and egg-laying hens in a way that prevented them from lying down, standing up, fully extending their limbs, or turning around freely. California farmers were given six years to restructure their farming practices.

In 2010, the California legislature enacted Assembly Bill 1437 ("AB 1437") to extend Proposition 2's confinement requirements for egg-laying hens to out-of-state farmers by prohibiting the sale in California of a shelled egg for human consumption if it was produced

by a hen that was not confined in compliance with Proposition 2. Health & Safety Code § 25996. The legislative history explained that "[t]he intent of this legislation [was] to level the playing field so that in-state producers [we]re not disadvantaged" by competition from out-of-state producers who were not subject to the same requirements. *See* Cal. Assembly Comm. on Agriculture, Bill Analysis of AB 1437, at 1 (May 13, 2009).[1]

## B. Proposition 12

In November 2018, California voters enacted Proposition 12, a ballot initiative promoted by animal welfare groups. Entitled the Prevention of Cruelty to Farm Animals Act, Prop. 12 § 1, Proposition 12's stated purpose is "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California," *id.* § 2. Proposition 12 was not accompanied by any legislative findings and did not cite any evidence that meat from veal calves or sows not housed in compliance with Proposition 12—let alone meat of the offspring of such sows—poses any increased risk of foodborne illness or other harms to consumers.

Proposition 12's central prohibition, not challenged here, applies only to California farmers. It provides that "[a] farm owner or operator within the state shall not knowingly cause any covered animal to be confined in a cruel manner." Health & Safety Code § 25990(a). "Covered animal" means "any calf raised for veal, breeding pig, or egg-laying hen who is kept on a farm." *Id.* § 25991(f).[2] "Farm" means "the land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food or fiber." *Id.* § 25991(i). The definition of

---

[1] A coalition of States challenged AB 1437's sales ban under the Commerce Clause, but their challenge was rejected for lack of standing. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017). The States then unsuccessfully sought to invoke the Supreme Court's original jurisdiction. *See Missouri v. California*, No. 22O148 (filed Dec. 7, 2017).

[2] Because this suit seeks relief only on behalf of pork and veal producers, the ensuing discussion focuses on the statute's requirements for pork and veal.

"farm" excludes "live animal markets" and "establishments at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.)." *Id.*

"Confined in a cruel manner" means any one of the following acts:

(1) Confining a covered animal in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely.

(2) After December 31, 2019, confining a calf raised for veal with less than 43 square feet of usable floorspace per calf.

(3) After December 31, 2021, confining a breeding pig with less than 24 square feet of usable floorspace per pig.

*Id.* § 25991(e)(1)–(3). These confinement requirements are subject to a number of exceptions. They do not apply during medical research, veterinary care, transportation, exhibitions, slaughter, or during temporary periods for animal husbandry. *Id.* § 25992(a)–(e), (g). And they do not apply to a breeding pig during the five-day period prior to its expected delivery date and when it is nursing offspring. *Id.* § 25992(f).

Following the model of AB 1437, Proposition 12 also includes a sales ban that extends the statute's confinement requirements to out-of-state producers whose products are sold in California. As relevant here, it provides that "[a] business owner or operator shall not knowingly engage in the sale within the state" of any "(1) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner," or (2) "Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner." *Id.* § 25990(b)(1)–(2).[3] Violation of the sales ban is a misdemeanor punishable by a fine of up to $1,000 and up to 180 days' imprisonment. *Id.* § 25993(b).

---

[3] The term "sale" means "a commercial sale by a business that sells any item covered by this chapter, but does not include any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act." *Id.* § 25991(o). A "sale" is "deemed to occur at the location where the buyer takes physical possession of [a covered] item." *Id.* The sales ban applies to uncooked cuts of pork and veal, but does not apply to

4

### C.    Implementing Regulations

Proposition 12 requires the California Department of Food and Agriculture and the State Department of Public Health to promulgate implementing regulations by September 1, 2019. *Id.* § 25993. As of this filing, proposed regulations have not yet been issued.

### D.    This Lawsuit

The Meat Institute is a national trade association that represents meat packers and processors. Gallimore Decl. ¶ 2. Its members own and raise hogs and veal calves in States across the country and sell pork and veal in California. *Id.* ¶ 5. The Meat Institute advocates for its members in connection with legislation and regulation affecting the meat industry. *Id.* ¶ 3. It brings this suit on behalf of members who sell pork and veal in California and challenges Proposition 12's sales ban as applied to pork and veal produced outside California. The Meat Institute seeks declaratory and injunctive relief because the sales ban violates the Commerce Clause and the federal structure of the Constitution.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary injunctive relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018). These factors are balanced on a "sliding scale," "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Daniels*, 889 F.3d at 615.

---

"combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products." *Id.* § 25991(u)–(v).

## I.   The Meat Institute Is Likely To Prevail On The Merits.

The Commerce Clause empowers Congress "to regulate commerce with foreign nations, and among the several states." U.S. Const. art. I, § 8, cl. 3. "[T]he Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 98 (1994). As the Supreme Court reaffirmed this year, "the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine*, 139 S. at 2459 (internal quotation marks omitted). "The Framers granted Congress plenary authority over interstate commerce in 'the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Or. Waste*, 511 U.S. at 98 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979)).

Under the Commerce Clause, a state law that "[d]iscriminat[es] against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the [state] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Carbone*, 511 U. S. at 392. "[S]tate statutes that clearly discriminate against interstate commerce are routinely struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988) (citations omitted). This heightened scrutiny applies not only to statutes that facially discriminate, but also to facially neutral statutes that have a "discriminatory purpose or discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (citation omitted); *see W. Lynn Creamery*, 512 U.S. at 194; *Hunt*, 432 U.S. at 350–53.

Further, "[a] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336. This rule, which stems from both the Commerce Clause and

6

structural federalism, "reflect[s] the Constitution's special concern both with the mainte-
nance of a national economic union unfettered by state-imposed limitations on interstate
commerce and with the autonomy of the individual States within their respective spheres."
*Id.* at 335–36. Under this doctrine, "States and localities may not attach restrictions to ex-
ports or imports in order to control commerce in other States." *Carbone*, 511 U.S. at 393
(citing *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)). "One state cannot be permitted
to dictate what other states must do within their own borders." *Daniels*, 889 F.3d at 615;
*see Christies, Inc.*, 784 F.3d at 1323; *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993).

Finally, a law violates the Commerce Clause if "the burden imposed on [interstate]
commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at
142. "[T]he incantation of a purpose to promote the public health or safety does not insulate
a state law from Commerce Clause attack." *Kassel v. Consol. Freightways Corp. of Del.*,
450 U.S. 662, 670 (1981) (plurality). "Regulations designed for that salutary purpose nev-
ertheless may further the purpose so marginally, and interfere with commerce so substan-
tially, as to be invalid under the Commerce Clause." *Id.*; *see also Raymond Motor Transp.,
Inc. v. Rice*, 434 U.S. 429, 443–47 (1978).

### A.   Proposition 12's Sales Ban Is A Protectionist Trade Barrier.

1.     The Commerce Clause "is driven by concern about 'economic protectionism—
that is, regulatory measures designed to benefit in-state economic interests by burdening
out-of-state competitors.'" *Dep't of Revenue v. Davis*, 553 U.S. 328, 337–38 (2008).
"[R]emoving state trade barriers was a principal reason for the adoption of the Constitu-
tion." *Tenn. Wine*, 139 S. Ct. at 2460. Thus, the Supreme Court has consistently struck down
statutes that "violat[e] the principle of the unitary national market by handicapping out-of-
state competitors, thus artificially encouraging in-state production even when the same
goods could be produced at lower cost in other States." *W. Lynn Creamery*, 512 U.S. at 193.

Proposition 12's sales ban is unconstitutional because its purpose and effect are to
protect California producers from out-of-state competitors with lower production costs. *See
id.* at 194 (finding Massachusetts pricing order "clearly unconstitutional" because "[i]ts

7

avowed purpose and its undisputed effect [we]re to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other States"). Proposition 12's sales ban is the direct lineal descendent of AB 1437, which added the sales ban "to level the playing field so that in-state producers [we]re not disadvantaged" by competition from out-of-state producers who were not subject to Proposition 2's confinement requirements. Cal. Assembly Comm. on Agriculture, Bill Analysis of AB 1437, at 1 (May 13, 2009); *see Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 402 n.4 (9th Cir. 2015) ("Courts have considered legislative history to determine whether local action was motivated by a discriminatory purpose."). That is the paradigm of a discriminatory purpose. *See Int'l Franchise Ass'n*, 803 F.3d at 401 ("[S]tatutes struck down for their impermissible purpose have contained language promoting local industry or seeking to level the playing field.").

Likewise, the sales ban's intended and inevitable effect is to protect California producers from bearing costs not borne by out-of-state competitors. It does so by subjecting out-of-state competitors to Proposition 12's confinement requirements if they want to compete in California. The sales ban thus operates as a protectionist trade barrier, blocking the flow of goods in interstate commerce unless out-of-state producers comply with California's regulations. In this way, Proposition 12 neutralizes the cost advantage out-of-state producers would have if they could sell their products in California without complying with the confinement requirements that California imposes on its own producers. "This effect renders the [sales ban] unconstitutional, because it, like a tariff, 'neutraliz[es] advantages belonging to the place of origin.'" *W. Lynn Creamery*, 512 U.S. at 196 (quoting *Baldwin*, 294 U.S. at 527); *see also Hunt*, 432 U.S. at 351 (striking down North Carolina apple labeling law because it had "the effect of stripping away" out-of-state producers' "competitive and economic advantages" and had "a leveling effect which insidiously operate[d] to the advantage of local apple producers"); *Cloverland-Green Spring Dairies, Inc. v. Penn. Milk Mktg. Bd.*, 298 F.3d 201, 212 (3d Cir. 2002) ("*Baldwin* and [*Hunt*] show that if a state regulation has the effect of protecting in-state businesses by eliminating a competitive advantage possessed by their out-of-state counterparts, heightened scrutiny applies.").

The Supreme Court's decision in *Baldwin* illustrates the principle that States may not use a sales ban to level the regulatory playing field and thereby eliminate the competitive advantage out-of-state producers enjoy due to less burdensome regulatory requirements in their home States.[4] There, the Court struck down a New York law that prohibited the sale in New York of milk imported from another State if the price paid to the out-of-state producer was lower than the minimum price that New York law required to be paid to in-state producers. 294 U.S. at 519. The law's purpose was to "keep the system [of minimum milk prices] unimpaired by competition" from out-of-state milk producers whose home States had not imposed minimum prices. *Id.* Writing for a unanimous Court, Justice Cardozo rejected this discriminatory trade barrier because "the avowed purpose of the obstruction, as well as its necessary tendency, [was] to suppress or mitigate the consequences of competition between the states." *Id.* at 522. "Restrictions so contrived," the Court concluded, "are an unreasonable clog upon the mobility of commerce" because they are "designed to neutralize advantages belonging to the place of origin." *Id.* at 527. Likewise here, California cannot prop up its in-state industry with a "contrived" sales ban that neutralizes the competitive advantage of out-of-state producers whose home States have not enacted comparable confinement laws. *See also Cloverland-Green*, 298 F.3d 201 at 213 (holding heightened scrutiny would apply if Pennsylvania's minimum milk prices eliminated a competitive advantage enjoyed by dealers "whose home states do not prop up milk producers' prices").

Nor does it matter that Proposition 12 subjects in-state and out-of-state producers to the same confinement requirements. Even if a law is facially neutral, that says nothing about whether the law has an impermissible protectionist purpose or effect.[5] "[I]t is clear that state

---

[4] Decided in 1935, *Baldwin* is a pillar of the Supreme Court's Commerce Clause jurisprudence. *See, e.g.*, *W. Lynn Creamery*, 512 U.S. at 193–94; *Carbone*, 511 U.S. at 392; *Wyoming v. Oklahoma*, 502 U.S. 437, 456–57 (1992); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580–84 (1986); *City of Phila. v. New Jersey*, 437 U.S. 617, 623–24 (1978); *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 531–33, 535 (1949).

[5] The Ninth Circuit concluded that AB 1437 was not discriminatory for purposes of "cases granting *parens patriae* standing to challenge discrimination against a state's citizens." *Missouri*, 847 F.3d at 655. But it did not address whether AB 1437 had a protectionist purpose or effect under the Commerce Clause. Likewise, *Ass'n des Eleveurs de Canards et d'Oies*

9

laws that are facially neutral but have the effect of eliminating a competitive advantage possessed by out-of-state firms trigger heightened scrutiny." *Id.* at 211 (citing *Hunt* and *Baldwin*). Again, the same was true in *Baldwin*: the New York law struck down there imposed the same minimum-price requirement on out-of-state sales and in-state sales. Likewise, the North Carolina law struck down in *Hunt* applied the same labeling requirements "to all applies sold in closed containers in the State without regard to their point of origin." 432 U.S. at 349. The laws in *Baldwin* and *Hunt* were unconstitutional despite their facial neutrality because of their impermissible "leveling effect." *Id.* at 351. Proposition 12's sales ban is no different. It too "insidiously operates to the advantage of local … producers" by "stripping away" out-of-state producers' competitive advantage. *Id.*

Proposition 12 is no different from a hypothetical state law that banned the in-state sale of goods produced by out-of-state workers who were paid less than the State's minimum wage in order to protect in-state businesses from competition by businesses in States with lower minimum wages. Such a sales ban would be a patent violation of the Commerce Clause and could not be saved by asserting that the lower wages paid to workers in other States are "inhumane." *See Baldwin*, 294 U.S. at 528 (States may not "establish a wage scale … for use in other states, and … bar the sale of the products … unless the scale has been observed"). Proposition 12's sales ban is indistinguishable.

Finally, Proposition 12's sales ban is potentially discriminatory in two other respects. First, if the prohibition on confinement that prevents an animal from "turning around freely" (the "turnaround" standard) is construed by California to have taken immediate effect, the sales ban would disadvantage out-of-state producers, who were given *no* lead time to come into compliance. In contrast, in-state producers were given *six years'* lead time to come into compliance with the "turnaround" standard when it was first imposed on California farmers

---

*du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013), which upheld a California law banning the sale of fois gras produced by force-feeding a bird, *see id.* at 948, did not hold that a facially neutral sales ban is immune from Commerce Clause challenge based on its protectionist purpose or effect, *see Bacchus*, 468 U.S. at 270; *Hunt*, 432 U.S. at 350–53; *Cloverland*, 208 F.3d at 211.

by Proposition 2.[6] Second, if Proposition 12's confinement restrictions are construed not to apply to calves that are "culled" from California dairy farms for slaughter and marketed as "bob" veal (on the ground that such calves are not "raised for veal" by California dairy farmers), then the sales ban would give California bob veal producers a competitive advantage over out-of-state milk-fed veal producers. Bakke Decl. ¶ 17.

2.     Proposition 12's sales ban is invalid because California cannot "demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Carbone*, 511 U.S. at 392. As an initial matter, California cannot justify the sales ban as a means of ensuring regulatory parity for in-state and out-of-state producers whose products are sold in California. The ban must be "justified by a valid factor *unrelated to economic protectionism*," *New Energy*, 486 U.S. at 274 (emphasis added), and the forced regulatory parity the sales ban mandates *is* the protectionism. California has no valid interest in protecting its producers from the competitive disadvantage its confinement requirements create by subjecting out-of-state competitors to those same standards. "[T]he Commerce Clause prohibits a State from using its regulatory power to protect its own citizens from outside competition." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980).

Nor does California have a "legitimate *local* interest" in how farm animals are housed in other States and countries. *Carbone*, 511 U.S. at 392 (emphasis added). California has no authority to regulate the conditions under which farm animals are housed outside its border. *See Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1882) ("No State can legislate except with reference to its own jurisdiction.").[7] Nor can California justify the sales ban as a means to prevent California consumers from creating demand for products that result from out-of-state farming practices that California disfavors. The Supreme Court rejected precisely that

---

[6] Proposition 2 was adopted in November 2008 but did not become effective until January 2015. *See* Prop. 2, Official Voter's Information Guide (reproducing proponents' argument that farmers would have "ample time" to comply); *People v. Rose*, No. H038704, 2014 WL 4947314, at *11 (Cal. Ct. App. Oct. 2, 2014) (considering voter information guide).

[7] California's asserted interest in animal welfare is further undermined because Proposition 12 applies only to calves that are "raised for veal," and not to the thousands of similarly situated calves in California that are raised for milk and beef production. Bakke Decl. ¶ 16.

sort of argument in *Carbone*. There, the Court held that Clarkstown could not "justify [its discriminatory] flow control ordinance as a way to steer [locally generated] solid waste away from out-of-town disposal sites that it might deem harmful to the environment," even though the town was seeking to minimize its own environmental footprint. 511 U.S. at 393. Citing *Baldwin*, the Court concluded that allowing such a justification "would extend the town's police power beyond its jurisdictional bounds." *Id.* Just as Clarkstown could not require all locally generated waste to be processed locally to avoid contributing to out-of-town disposal practices it deemed harmful to the environment, California cannot close its borders to interstate commerce to avoid "contributing" to out-of-state farming practices it considers harmful to animals. To accept such a justification "would extend [California's] police power beyond its jurisdictional bounds." *Id.* If California wishes to diminish the demand its citizens create for imported goods produced in a manner that California disfavors, it must do so through means other than blocking interstate trade, such as through consumer-education initiatives. *See id.* (discussing "nondiscriminatory alternatives").

California also cannot justify the sales ban as a consumer-health measure. No scientific evidence establishes a link between Proposition 12's confinement requirements and a diminished risk of foodborne illness from pork or veal. Belk Decl. ¶¶ 8–16.[8] This is especially true regarding Proposition 12's ban on the sale of "the meat of immediate offspring of a covered animal who was confined in a cruel manner." Health & Safety Code § 25990(b)(2). No scientific evidence supports a connection between a sow's confinement conditions and any risk of foodborne illness from the meat of her offspring. Belk. Decl. ¶ 16. Piglets spend only a few weeks with the sow while nursing, during which time Proposition 12's confinement requirements do not apply. Health & Safety Code § 25992(f).

---

[8] The Official Voter's Information Guide for Proposition 12 reproduced proponents' concern about the risk of salmonella poisoning from caged chickens. But it said nothing about any risk of foodborne illness from pork or veal. And even as to eggs, the Food and Drug Administration has rejected as scientifically unreliable claims that "the hens' living conditions affect the likelihood of Salmonella-contamination or the nutritional value of the eggs." *Compassion Over Killing v. FDA*, 849 F.3d 849, 856 (9th Cir. 2017).

12

Moreover, an extensive scheme of federal regulation already exists to ensure meat safety. Belk Decl. ¶ 9. The Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 *et seq.*, requires the Department of Agriculture to inspect all cattle and swine slaughtered and processed for human consumption, and "establishes an elaborate system of inspecting live animals and carcasses in order to prevent the shipment of impure, unwholesome, and unfit meat and meat-food products." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455–56 (2012) (internal quotation marks and alterations omitted). The Department of Agriculture's Food Safety and Inspection Service ("FSIS") "has issued extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities," to promote the FMIA's "dual goals of safe meat and humane slaughter." *Id.* at 456 (citing 9 C.F.R. § 300.1 *et seq.* (2011)). Under these regulations, "FSIS inspects all meat and poultry animals to look for signs of disease, contamination, and other abnormal conditions, both before and after slaughter … on a continuous basis—meaning that no animal may be slaughtered and dressed unless an inspector has examined it." Renee Johnson, Congressional Research Service, *The Federal Food Safety System: A Primer* 6 (2016). "Inspectors monitor operations, check sanitary conditions, examine ingredient levels and packaging, review records, verify food safety plans, and conduct statistical sampling and testing of products for pathogens and residues during their inspections." *Id.* (footnote omitted).

Any attempt to justify Proposition 12's sales ban as a health and safety measure is further undermined by its exceptions. *See Raymond Motor Transp.*, 434 U.S. at 444–45 (asserted safety interest was undermined "by the maze of exemptions … the State itself allows"); *Kassel*, 450 U.S. at 671 n.12, 675–78 (plurality) (similar). The sales ban applies to "whole pork meat" and "whole veal meat," Health & Safety Code § 25990(b)(1)–(2), both of which are defined to exclude "combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products," *id.* § 25991(u)-(v). In addition, the statute exempts "any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act." *Id.* § 25991(o); *see*

*also id.* § 25991(i) (defining "farm" to exclude such establishments). The confinement requirements also do not apply to live animal markets, *id.* § 25991(i); during medical research, veterinary care, transportation, exhibition, or slaughter, *id.* § 25992(a)–(e); during temporary periods for animal husbandry purposes, *id.* § 25992(g); or during the five days before a sow's expected delivery date and when it is nursing piglets, *id.* § 25992(f). These exceptions belie any notion that the prohibited sales pose a genuine public-health danger.

Given the lack of scientific evidence that confining sows and calves as required by Proposition 12 has any consumer health or safety benefit, the existing federal inspection scheme, and the statute's numerous exceptions, Proposition 12's sales ban cannot "pass the 'strictest scrutiny.'" *Or. Waste*, 511 U.S. at 101 (quoting *Hughes*, 441 U.S. at 337). California's burden of justification is "heavy," *id.*, and cannot be met by the unsupported "incantation of a purpose to promote the public health or safety," *Kassel*, 450 U.S. at 670 (plurality). *See also Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 366 (1992). Even under the less exacting *Pike* test reserved for nondiscriminatory laws, any assertion that Proposition 12's sales ban promotes health and safety is entitled to no deference, both because the asserted interest is illusory and because Proposition 12 was not the product of legislative fact-finding and deliberation. *See infra*, Part I.C.

California also has nondiscriminatory alternatives. If it is concerned that the prohibited sales pose a health and safety risk not already adequately addressed by the federal inspection scheme, it can subject whole pork and veal meat imported into the State to additional inspection at the point of sale to consumers. *See, e.g.*, Health & Safety Code § 114035. And it can promote consumer education to help ensure the safe handling and cooking of raw meats. What it cannot do is ban interstate trade in pork and veal based on unfounded assertions that farming practices in other States and countries pose speculative risks to California consumers' health and safety. *Cf. Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 380 (1976) ("Mississippi is not privileged under the Commerce Clause to force its own judgments as to an adequate level of milk sanitation on Louisiana at the pain of an absolute ban on the interstate flow of commerce in milk.").

14

**B.     Proposition 12's Sales Ban Regulates Extraterritorial Commerce.**

Proposition 12 also violates the constitutional prohibition on extraterritorial state regulation. This prohibition stems from both the Commerce Clause and the federal structure of the Constitution, both of which preclude "the application of a state statute to commerce that takes places wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336; *see id.* at 332 (reiterating the Supreme Court's "established view that a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause"). Under this doctrine, "States and localities may not attach restrictions to exports or imports in order to control commerce in other States," as this would "extend [their] police power beyond its jurisdictional bounds." *Carbone*, 511 U.S. at 393 (citing *Baldwin*, 294 U.S. 511).

Here again, *Baldwin* is controlling. In that case, New York sought to control the price of milk in Vermont by banning the sale of milk bought from Vermont dairies at a price lower than New York's minimum price. 294 U.S. at 519. The Court rejected this attempt to control extraterritorial commerce, holding that "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there." *Id.* at 521. While acknowledging New York's right to exclude unwholesome milk, the Court rejected New York's attempt to justify the sales ban as a police-power measure designed to "impose a higher standard of quality and thereby promote health" by raising dairy farmers' income, because "[o]ne state may not put pressure of that sort upon others to reform their economic standards." *Id.* at 524. "If farmers or manufacturers in Vermont are abandoning farms or factories, or are failing to maintain them properly, the legislature of Vermont and not that of New York must supply the fitting remedy." *Id.*

Proposition 12's sales ban mirrors the sales ban struck down in *Baldwin*. California cannot directly regulate out-of-state farming practices by requiring out-of-state farmers to adhere to its confinement requirements upon pain of criminal or civil penalty. *See id.* at 519; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996) ("[N]o single State [can]… impose its own policy choice on neighboring States."); *Bonaparte*, 104 U.S. at 594 ("No State can

15

legislate except with reference to its own jurisdiction."). But neither can California regulate out-of-state farming "by indirection" by banning the sale in California of wholesome imported meats unless the out-of-state farmer complied with California's confinement regulations. *Baldwin*, 294 U.S. at 524. Allowing California in this way to control farming practices in other States and countries that it lacks power to regulate directly would "extend [California's] police power beyond its jurisdictional bounds." *Carbone*, 511 U.S. at 393.

Nor is it an answer to argue that California is not regulating commerce wholly outside its borders because Proposition 12's sales ban forbids only sales that occur in California and not sales in other States. The same was true in *Baldwin*: New York's law banned only in-state sales, but its effect was to control extraterritorial commerce. Likewise here, California cannot use a ban on in-state sales as a jurisdictional "hook" to regulate upstream commercial practices in other States and countries that California finds objectionable. *See Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986) (the "mere fact that the effects" of a state law "are triggered only by sales of [products] within the State … does not validate the law if it regulates the out-of-state transactions of [producers] who sell in-state"); *Daniels*, 889 F.3d at 615 ("The mere fact that some nexus to a state exists will not justify regulation of wholly out-of-state transactions.").

Both the Ninth Circuit[9] and other circuits[10] have struck down similar laws that regulate extraterritorial commerce. For example, in *Legato Vapors, LLC v. Cook*, 847 F.3d 825

---

[9] *See Daniels*, 889 F.3d at 615–16 (holding that California law regulating out-of-state waste disposal was likely invalid); *Christies*, 784 F.3d at 1323–25 (striking down California law regulating out-of-state art sales); *NCAA*, 10 F.3d at 638–40 (striking down Nevada law regulating NCAA's out-of-state enforcement procedures).

[10] *See, e.g.*, *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 670–74 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1168 (2019); *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 829–37 (7th Cir. 2017); *North Dakota v. Heydinger*, 825 F.3d 912, 922 (8th Cir. 2016) (Loken, J.); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 165 F.3d 1151, 1153–54; (7th Cir. 1999) (per curiam); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 69–70 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 657–61 (7th Cir. 1995).

(7th Cir. 2017), the Seventh Circuit invalidated an Indiana law that forbade the sale of vap-ing products in Indiana unless out-of-state manufacturers complied with in-state regulations concerning the design and operation of production facilities. *Id.* at 832–37. The law imper-missibly "regulate[d] the production facilities and processes of out-of-state manufacturers and thus wholly out-of-state commercial transactions." *Id.* at 837. Although the state could impose "reasonable and even-handed purity requirements on vaping products sold in Indi-ana," it could "not try to achieve that goal by direct extraterritorial regulation of the manu-facturing processes and facilities of out-of-state manufacturers." *Id.* at 834. "With almost two hundred years of precedents to consider," the court found not "a single appellate case permitting any direct regulation of out-of-state manufacturing processes and facilities com-parable to the Indiana Act." *Id.* at 831. Proposition 12's sales ban is indistinguishable from the law struck down in *Legato Vapors*. Both improperly condition in-state sales on out-of-state producers' compliance with in-state regulations of their production facilities.

   Proposition 12's sales ban is unlike laws that the Ninth Circuit has upheld against extraterritoriality challenges. For example, the Ninth Circuit recently rejected extraterrito-riality challenges to California and Oregon fuel regulations that create a system of credits and deficits based on a fuel's "lifecycle" greenhouse gas emissions (*i.e.*, the total emissions associated with its production, transportation, and combustion). *See Rocky Mountain Farm-ers Union v. Corey* (*RMFU II*), 913 F.3d 940, 951–54 (9th Cir. 2019); *Am. Fuel & Petro-chemical Mfrs. v. O'Keefe*, 903 F.3d 903, 916–17 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2013 (2019); *Rocky Mountain Farmers Union v. Corey* (*RFMU I*), 730 F.3d 1070, 1101–06 (9th Cir. 2013). In these cases, the Ninth Circuit held that a State "may regulate with reference to local harms, structuring its internal markets to set incentives for firms to pro-duce less harmful products for sale in California." *RMFU I*, 730 F.3d at 1104. That rule does not apply here, for two reasons. First, the sales ban does not merely create "incentives" for out-of-state producers to comply. *Id.* at 1101, 1103. It entirely bans noncompliant prod-ucts from the California market. *Cf. id.* at 1105 ("No form of fuel would be excluded from … any state's market …."). Second, "the harms California intended to prevent" are *not*

17

"within the state's borders." *RMFU II*, 913 F.3d at 953. Because California's health justification is illusory, the *only* harms the ban seeks to prevent—the asserted harms to farm animals in other States—are outside California's borders and thus beyond its police power.

Nor does *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013), which upheld a California law banning the sale of fois gras produced by force-feeding a bird, support a different conclusion. First, this case involves concerns about protectionism that were not present in *Ass'n des Eleveurs*. *See Energy & Envt. Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015) (Gorsuch, J.) (observing that the Supreme Court's extraterritoriality cases also involved concerns about discrimination). Second, a central premise of *Ass'n des Eleveurs* is that "*Healy* and *Baldwin* are not applicable to a statute that does not dictate the price of a product and does not tie the price of its in-state products to out-of-state prices." 729 F.3d at 951 (internal quotation marks and alteration omitted). Since then, however, the en banc Ninth Circuit has held that *Healy* applied to a non-price control, namely, a statute that controlled the conduct of out-of-state art sellers by requiring them to take affirmative steps to locate the artist and pay the artist a royalty. *Christies*, 784 F.3d at 1324–25 & n.1 ("We merely apply the simple, well established constitutional rule summarized in *Healy*.").[11] Further, the artificial limitation the *Ass'n des Eleveurs* court engrafted on the extraterritoriality doctrine is demonstrably inconsistent with Supreme Court precedent, which has applied the doctrine outside the price-control context, *see Carbone*, 511 U.S. at 393, as the Ninth Circuit has recognized, *see RMFU I*, 730 F.3d at 1102 (recognizing that *Carbone* applied the "rule from *Healy* and *Brown-Forman*" to an effort to impose "a minimum standard of environmental protection"). Under controlling precedent, California's effort to impose confinement standards for farm animals located outside of California violates the extraterritoriality doctrine applied in *Healy* and *Baldwin*.

---

[11] *See also Daniels*, 889 F.3d at 615–16 (applying extraterritoriality doctrine to statute controlling waste disposal); *NCAA*, 10 F.3d at 638–40 (applying extraterritoriality doctrine to statute controlling enforcement procedures); *Meyer*, 63 F.3d at 659 ("Although cases like *Healy* and *Brown-Forman Distillers Corp.* involved price affirmation statutes, the principles set forth in these decisions are not limited to that context.").

The unconstitutionality of Proposition 12's sales ban is further confirmed by "considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336. There is a real concern that other States will follow California's lead—indeed, Massachusetts has enacted a similar sales ban. *See* Prevention of Farm Animal Cruelty Act, 2016 Mass. Acts 1052; *cf. Ass'n des Eleveurs*, 729 F.3d at 951 (finding fear of balkanization speculative where no other state banned fois gras). If every State enacted a similar sales ban, producers would be forced to choose between complying with the most restrictive confinement regulation, segregating their operations to serve different States, or abandoning certain markets altogether. The result would be "to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude," *Healy*, 491 U.S. at 337, and to foment "rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation," *Baldwin*, 294 U.S. at 522. *See also Legato Vapors*, 847 F.3d at 834.

Finally, if California can ban the sale of wholesome pork and veal because it objects to the way farm animals are housed in other States, there would be no reason California or any other State could not likewise ban the sale of any other imported product because it objects to the way it was produced. By the same logic, California could ban the sale of goods produced by companies that pay their workers less than California's minimum wage, that do not afford "humane" family leave, or whose boards lack a California-specified level of gender balance. Texas, in turn, could ban the sale of goods produced by companies that discriminate against employees based on their political viewpoints or whose workers lack right-to-work protections. Embracing a principle with such far-reaching implications would spell the end of the national common market the Commerce Clause was enacted to protect.

## C.    Proposition 12's Sales Ban Excessively Burdens Interstate Commerce.

Proposition 12's sales ban also violates the Commerce Clause because it imposes substantial burdens on interstate commerce that clearly outweigh any valid state interest. *See Pike*, 397 U.S. at 142; *Union Pac. R.R. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 870

19

1  (9th Cir. 2003). This is not a case where an otherwise legitimate state regulation has "indi-
2  rect" or "incidental" interstate effects. *Pike*, 397 U.S. at 142. The sales ban's entire point is
3  to affect interstate commerce. Because the ban directly and disproportionately burdens in-
4  terstate commerce, and there is no evidence it produces *any* legitimate local benefits, it
5  impairs commerce to a degree that is "clearly excessive," *id.*, and "cannot be harmonized
6  with the Commerce Clause," *Kassel*, 450 U.S. at 671 (plurality).

7  First, there is no question that Proposition 12 substantially burdens the interstate mar-
8  ket for veal and pork. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144,
9  1155–56 (9th Cir. 2012). Compliance with Proposition 12's confinement requirements
10 would require extensive and costly changes to current industry practices. For example, the
11 milk-fed veal industry only recently completed a 10-year, $150 million dollar effort to tran-
12 sition to tether-free group housing. Bakke Decl. ¶¶ 4–7. Today, veal producers generally
13 house their calves in line with European Union ("EU") standards, which before Proposition
14 12 imposed the strictest square-footage requirements in the world. *Id.* ¶ 6. Proposition 12
15 requires more than *twice* as many square feet per calf as EU standards, and thus would
16 require veal producers to make expensive new investments to remodel existing barns and
17 construct new ones, while they are still paying down the debt incurred for the last round of
18 capital improvements. *Id.* ¶¶ 8–10; Catelli Decl. ¶¶ 8–9; Friesen Decl. ¶¶ 11–13.

19 Likewise, Proposition 12 would require significant changes to the manner in which
20 breeding sows are housed. Across the industry, sows are housed in breeding stalls during
21 the insemination period to protect the sows and ensure effective insemination, and many
22 sows are housed in gestation stalls thereafter. Darrell Decl. ¶ 9; Neff Decl. ¶ 5; Rennells
23 Decl. ¶ 6; Turner Decl. ¶ 5; Bollum Decl. ¶ 4. Proposition 12's turnaround standard would
24 require the elimination of gestation stalls and possibly breeding stalls as well—a require-
25 ment that California farmers were given six years to implement under Proposition 2—and
26 a transition to group housing that gives each sow 24 square feet of space by January 2022.
27 Further, products would need to be segregated during processing and distribution to satisfy
28 Proposition 12. Darrell Decl. ¶ 14; Neff Decl. ¶¶ 9–11; Rennells Decl. ¶ 14; Turner Decl.

20

¶¶ 13–15; Bollum Decl. ¶¶ 7–10. As a result, Proposition 12 imposes substantial barriers to interstate commerce and may close off the California market to a large swath of integrated producers and the independent farmers upon which they rely to provide whole pork to customers in California. Darrell Decl. ¶ 15; Neff Decl. ¶ 12; Rennells Decl. ¶ 15; Turner Decl. ¶¶ 15–16; Bollum Decl. ¶ 11.

The sales ban thus presents out-of-state veal and pork producers with a Hobson's choice: either comply with California's confinement requirements by making costly alterations to facilities and/or slashing output, or be excluded from the California market. Either way, the result will be less veal and pork, produced, processed, and distributed less efficiently, to fewer customers, at higher prices. To the extent businesses exit California in response to the sales ban, it will effectively cut the State off from the interstate market, "interfer[ing] with [its] natural functioning . . . through burdensome regulation." *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 805–06 (1976). And to the extent some businesses choose to comply, the sales ban will "impose a substantial burden" on the interstate trade that remains. *Raymond Motor Transp.*, 434 U.S. at 445. To compensate producers for their increased costs, processors and distributors will have to pay a premium for Proposition 12-compliant animals, and those that do not wish to follow Proposition 12 on a nationwide basis will have to reorganize slaughter, packing, and distribution operations to segregate animals and products that comply with the law from those that do not. At each step from farm to table, the sales ban "engenders inefficiency and added expense," *Kassel*, 450 U.S. at 674 (plurality), forcing firms to bear "substantially increase[d]" costs and distorting the "interstate movement of goods," *Raymond Motor Transp.*, 434 U.S. at 445.

These interstate burdens are direct, non-speculative, significant in magnitude, and will be felt inside and outside of California. *E.g.*, Darrell Decl. ¶¶ 10, 15; Neff Decl. ¶¶ 11–13; Rennells Decl. ¶¶ 9, 15–16; Turner Decl. ¶¶ 10–11, 17; Bollum Decl. ¶¶ 5, 11. The sales ban will cost the veal and pork industries hundreds of millions of dollars, and compliance would require independent farmers, packers, and distributors to restructure operations from

coast to coast. *Cf. Ass'n des Eleveurs*, 729 F.3d at 949–50, 952 (plaintiffs produced no evidence of a burden associated with producing foie gras without using banned production methods); *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 731 F.3d 843, 848 (9th Cir. 2013) (plaintiffs showed only "highly attenuated" possibility of burden); *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994) (plaintiff "offered no evidence . . . [of] any economic effect on consumers or members of the industry in other states"). Moreover, California does not produce milk-fed veal, Bakke Decl. ¶ 16, and accounts for only a small percentage of U.S. hog production, *see* USDA, National Agricultural Statistics Service, *Livestock Slaughter* 44–45 (Apr. 2019). And farms within California have been subject to Proposition 2's confinement standards for years and are directly subject to Proposition 12's confinement standards. The sales ban's burdens thus "fall [most] heavily on out-of-state interests," a fact of "special importance." *Pac. Nw. Venison*, 20 F.3d at 1015.

These substantial burdens violate the Commerce Clause because there is not "even a colorable showing" that the sales ban advances any legitimate local interest. *Optometrists*, 682 F.3d at 1156 n.17. Proposition 12 identifies two purposes—"prevent[ing] animal cruelty" and reducing "the risk of foodborne illness." Both benefits are illusory. As discussed above, California has no legitimate *local* interest in regulating farming conditions in other States and countries, or in preventing California consumers from buying wholesome imported meats produced under conditions California disfavors. The ban's purported role in preventing foodborne illness is likewise illusory. There is no link between Proposition 12's confinement requirements and foodborne illness. *See supra*, Part I.A. And, importantly, this case involves no "legislative judgments because [the ban is] the produc[t] of a ballot proposition." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1167–68 (S.D. Cal. 2019), *appeal docketed*, No. 19-55376 (9th Cir. Apr. 4, 2019). Any empirical judgments embodied in Proposition 12 are thus entitled to no deference. *See id.*; *United States v. Manning*, 434 F. Supp. 2d 988, 1014 (E.D. Wash. 2006), *aff'd*, 527 F.3d 828 (9th Cir. 2008).

## II.     Proposition 12 Will Irreparably Harm The Meat Institute's Members.

The Meat Institute's members will suffer irreparable harm absent preliminary relief. First, because constitutional violations cannot be adequately remedied through damages, they alone can show irreparable harm. *See, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1058–59 (9th Cir. 2009). Second, where, as here, the Eleventh Amendment sovereign immunity of a state government bars a plaintiff from recovering damages from the State, such loss can also constitute irreparable harm. *See, e.g.*, *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). And third, loss of control over business reputation and damage to customer goodwill can also qualify as irreparable harm. *See, e.g.*, *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

In particular, a state law imposes irreparable harm when it puts a regulated party to an imminent Hobson's choice: (i) submit to an unconstitutional law that imposes significant, unrecoverable compliance costs, or (ii) or forgo participation in a given market and thereby lose the benefit of that market and consumer goodwill. *See Am. Trucking Assn's*, 559 F.3d at 1057–59. Proposition 12 presents Meat Institute members with just such a choice: they can either come into compliance with Proposition 12's confinement standards by building costly new barns and pens and/or slashing output, or be forced from the California market.

As explained more fully in the accompanying declarations, submitting to Proposition 12's unconstitutional requirements would require Meat Institute members to incur immediate, significant, and unrecoverable costs. Regarding veal calves, Proposition 12's square-footage requirement takes effect on January 1, 2020. Because it is impossible for veal producers to construct the necessary additional barn space by that date, the only way they can comply with Proposition 12 in the near term is by cutting their production. Bakke Decl. ¶ 11; Catelli Decl. ¶¶ 8–9; Friesen Decl. ¶ 9. For some, this is not economically feasible and will result in exclusion from the California market, with consequent loss of revenues and

customer goodwill. Catelli Decl. ¶ 10. For those who remain, the decrease in output will cause significant harm, including likely layoffs of workers. Friesen Decl. ¶ 10.

Regarding pork, to the extent Proposition 12's "turnaround" standard is currently in effect and not subject to statutory exceptions, it would require out-of-state pork producers to eliminate breeding stalls and gestation crates immediately (whereas California farmers were given six years to come into compliance). That discriminatory requirement would make compliance in the near term virtually impossible, and would force out-of-state parties from the California market. Darrell Decl. ¶¶ 10, 15; Neff Decl. ¶¶ 8, 12; Rennells Decl. ¶¶ 9, 15–16; Turner Decl. ¶¶ 10–11, 17; Bollum Decl. ¶¶ 4, 11. And to be in a position to continue serving the California market at current production levels after the square-footage requirement for breeding sows takes effect in January 2022, pork suppliers would have to immediately begin the costly and time-consuming process of redesigning facilities and con-structing new barn space, as well as persuading independent pig farmers who supply them to do the same. Darrell Decl. ¶¶ 10–13; Neff Decl. ¶¶ 4–8; Rennells Decl. ¶¶ 9–13; Turner Decl. ¶¶ 8–12; Bollum Decl. ¶¶ 4–6. Independent farmers would have to expend significant resources obtaining necessary financing, rebuilding barns, and renegotiating production contracts. Darrell Decl. ¶¶ 11–13; Neff Decl. ¶¶ 5–8; Rennells Decl. ¶¶ 11–13; Turner Decl. ¶¶ 10–12; Bollum Decl. ¶¶ 5–6. Further, compliance would impose substantial costs on the processing and distribution of meat destined for California, which would require segregated production and distribution lines. Darrell Decl. ¶ 14; Neff Decl. ¶¶ 9–11; Rennells Decl. ¶ 14; Turner Decl. ¶¶ 13–15; Bollum Decl. ¶¶ 7–10. These multi-layered efforts to satisfy Proposition 12's requirements would need to begin immediately. Darrell Decl. ¶ 12; Neff Decl. ¶ 8; Rennells Decl. ¶ 12; Turner Decl. ¶¶ 7, 11; Bollum Decl. ¶¶ 4–5. And none of these costs would be recoverable because of California's Eleventh Amendment immunity.

Alternatively, Proposition 12 could force the Meat Institute's members to abandon the California market in whole or in part. Darrell Decl. ¶ 15; Neff Decl. ¶¶ 12–13; Rennells Decl. ¶¶ 15–16; Turner Decl. ¶¶ 16–17; Bollum Decl. ¶ 11. That too would cause irreparable harm to Meat Institute members by denying them the ability to generate revenue from an

important market and harming goodwill among customers.; Darrell Decl. ¶ 15; Neff Decl. ¶¶ 12–13; Rennells Decl. ¶¶ 15–16; Turner Decl. ¶¶ 16–17; Bollum Decl. ¶¶ 11–12.

### III.   The Equities And The Public Interest Favor Preliminary Injunctive Relief.

Finally, the balance of the equities and the public interest strongly favor a preliminary injunction. Where, as here, governmental action is challenged, these inquiries merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1099 (9th Cir. 2014). Both factors require compliance with the Constitution. *See Cal. Pharmacists Ass'n*, 563 F.3d at 852–53 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state to continue to violate the requirements of federal law, especially when there are no adequate remedies available to compensate [plaintiffs] for the irreparable harm that would be caused by the continuing violation.").

Moreover, as just shown, the Meat Institute's members will suffer severe irreparable harm without a preliminary injunction. California, by contrast, will suffer no harm if Proposition 12's sales ban is put on hold pending adjudication of the lawsuit. The sales ban serves no legitimate local interest regarding either the welfare of animals in California or the health and safety of California consumers. As a result, the balance of hardships "tips sharply" in the Meat Institute's favor, making injunctive relief appropriate as long as the Meat Institute has at least raised "serious questions going to the merits," which it unquestionably has. *See hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-16783, 2019 WL 4251889, at *4 (9th Cir. Sept. 9, 2019). Proposition 12's sales ban should be enjoined.

### <u>CONCLUSION</u>

For the forgoing reasons, the Meat Institute respectfully requests that the Court preliminarily enjoin enforcement of Proposition 12's unconstitutional sales ban.

Respectfully submitted,

DATED:  October 4, 2019          SIDLEY AUSTIN LLP


/s/ Sean A. Commons
Paul J. Zidlicky (*pro hac vice* pending)
Eric D. McArthur (*pro hac vice* pending)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711

Sean A. Commons, SBN 217603
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Tel: (213) 896-6000
Fax: (213) 896-6600

*Attorneys for Plaintiff*

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES