Brian M. Boynton (SBN 22193)
brian.boynton@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel.: (202) 663-6044
Fax: (202) 663-6363

Matthew Tymann (SBN 326249)
matthew.tymann@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
50 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Tel.: (213) 443-5343
Fax: (213) 443-5400

*Attorneys for Amicus Curiae Association of California Egg Farmers*

**FILED**
CLERK, U.S. DISTRICT COURT

October 31, 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CMJ___ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| NORTH AMERICAN MEAT INSTITUTE,<br><br>*Plaintiff,*<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California, et al.,<br><br>*Defendants.* | Case No.    2:19-CV-08569-CAS (FFMx)<br><br>**AMICUS BRIEF OF ASSOCIATION OF CALIFORNIA EGG FARMERS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>The Honorable Christina A. Snyder<br>Date:        November 18, 2019<br>Time:        10:00 a.m.<br>Location:    Courtroom 8D<br><br>Complaint filed: October 4, 2019 |

No. 2:19-CV-08569-CAS

AMICUS BRIEF ISO
DEFENDANTS' OPPOSITION TO
MOT. FOR PRELIM. INJ.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................................1

INTRODUCTION ...................................................................................................2

BACKGROUND .....................................................................................................3

ARGUMENT ..........................................................................................................6

I.    PROPOSITION 12 DOES NOT DISCRIMINATE AGAINST
      INTERSTATE COMMERCE ..........................................................................7

II.   PROPOSITION 12 DOES NOT REGULATE
      EXTRATERRITORIALLY ...........................................................................13

III.  PLAINTIFF'S *PIKE* CLAIM IS FORECLOSED BY ASSOCIATION
      DES ELEVEURS ........................................................................................19

      A.    Proposition 12 Imposes No Substantial Burden .................................20

      B.    The Benefits of Proposition 12 Are Significant...................................23

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013) ........................................................*passim*

*Baldwin v. G.A.F. Seelig, Inc.*,
  294 U.S. 511 (1935) ......................................................................*passim*

*Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*,
  486 U.S. 888 (1988) ............................................................................ 20

*C & A Carbone, Inc. v. Town of Clarkstown*,
  511 U.S. 383 (1994) ...................................................................... 17, 20

*Comptroller of Treasury of Maryland v. Wynne*,
  135 S. Ct. 1787 (2015) ......................................................................... 7

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) .............................................................. 16

*Department of Revenue v. Davis*,
  553 U.S. 328 (2008) ...................................................................... 7, 19

*General Motors Corporation v. Tracy*,
  519 U.S. 278 (1997) ............................................................................ 19

*Healy v. Beer Institute, Inc.*,
  491 U.S. 324 (1989) ...................................................................... 14, 15

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ............................................................................ 11

*Maine v. Taylor*,
  477 U.S. 131 (1986) ............................................................................ 24

*Minnesota v. Clover Leaf Creamery Company*,
  449 U.S. 456 (1981) .............................................................. 12, 13, 14

*Missouri v. California*,
  139 S. Ct. 859 (2019) ........................................................................... 6

*Missouri v. Harris*,
    58 F. Supp. 3d 1059 (E.D. Cal. 2014), *aff'd*, 847 F.3d 646 (9th Cir.
    2017), *cert. denied*, 137 S. Ct. 2188 (2017) .......................................... 6

*National Association of Optometrists & Opticians v. Harris*,
    682 F.3d 1144 (9th Cir. 2012) ...................................................... 19, 20

*Osborn v. Ozlin*,
    310 U.S. 53 (1940) .............................................................................. 17

*Pacific Northwest Venison Producers v. Smitch*,
    20 F.3d 1008 (9th Cir.1994) ........................................................... 8, 21

*Pharmaceutical Research and Manufacturers of America v. County of
    Alameda*, 768 F.3d 1037 (9th Cir. 2014) ....................................... 8, 9

*Pharmaceutical Research and Manufacturers of America v. Walsh*,
    538 U.S. 644 (2003) ...................................................................... 15, 16

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ............................................................. 19, 20, 26

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) ...................................................... 12, 13

*Rocky Mountain Farmers Union v. Corey*,
    913 F.3d 940 (9th Cir. 2019) ........................................................ 13, 14

*Rosenblatt v. City of Santa Monica*,
    __ F.3d __, No. 17-55879, 2019 WL 4867397
    (9th Cir. Oct. 3, 2019)............................................................... 7, 8, 9

*Sam Francis Foundation v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) (en banc) ...................................... 14, 16

*S.D. Myers, Inc. v. City and County of San Francisco*,
    253 F.3d 461 (9th Cir. 2001) ............................................................ 18

*United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste
    Management Authority*, 550 U.S. 330 (2007) ........................... 7, 9, 19

*West Lynn Creamery v. Healy*,
    512 U.S. 186 (1994) ....................................................... 10, 11, 15, 16

**Statutes**

CAL. CODE REGS. tit. 3, § 1350 ................................................................. 5

CAL. CODE REGS. tit. 3, § 1350(d) ........................................................... 5

CAL. HEALTH & SAFETY CODE § 25990 ............................................ *passim*

CAL. HEALTH & SAFETY CODE § 25990(a)(2) ......................................... 23

CAL. HEALTH & SAFETY CODE § 25991 ................................................... 4

CAL. HEALTH & SAFETY CODE § 25991(e)(1) .......................................... 4

CAL. HEALTH & SAFETY CODE § 25991(f) ................................................ 4

CAL. HEALTH & SAFETY CODE § 25992 ................................................... 1

CAL. HEALTH & SAFETY CODE § 25993 ................................................... 1

CAL. HEALTH & SAFETY CODE § 25995 ................................................... 5

CAL. HEALTH & SAFETY CODE § 25995(c) ................................... 5, 12, 24

CAL. HEALTH & SAFETY CODE § 25996 ................................... 1, 4, 5, 12

**Other Authorities**

BALLOTPEDIA, California Proposition 12, Farm Animal
    Confinement Initiative (2018),
    https://ballotpedia.org/California_Proposition_12,_Farm_Animal_C
    onfinement_Initiative_(2018) ................................................................. 3

California Department of Food and Agriculture, Shell Egg Food Safety:
    Initial Statement of Reasons (July 2012),
    https://web.archive.org/web/20170201224432/http://www.cdfa.ca.g
    ov/ahfss/pdfs/regulations/Shell_Egg_Food_Safety_ISR_July_2012.
    pdf ........................................................................................................ 5

California General Election, Official Voter Information Guide
    (November 6, 2018),
    https://vig.cdn.sos.ca.gov/2018/general/pdf/complete-vig.pdf ........................... 24

California General Election, Text of Proposed Laws (November 6,
    2018), https://vig.cdn.sos.ca.gov/2018/general/pdf/topl.pdf#prop12 ................... 3

Ibarburu, Maro, *U.S. Flock Trends and Projections*, EGG INDUSTRY
    CENTER (Oct. 4, 2019) ........................................................................25

Pew Commission on Industrial Farm Animal Production, *Putting Meat
    on the Table: Industrial Farm Animal Production in America*
    (2008) https://www.pewtrusts.org/-
    /media/legacy/uploadedfiles/phg/content_level_pages/reports/pcifap
    finalpdf.pdf .......................................................................................25

# INTEREST OF AMICUS CURIAE

Amicus curiae Association of California Egg Farmers (ACEF) is a California nonprofit trade organization whose members are family-owned-and-operated egg farms.[1]  ACEF's members constitute a significant portion of the California egg industry.  It is estimated that they are responsible for more than 70% of the commercial, egg-laying hens in California.  Some of ACEF's members also produce eggs outside of California and import eggs into the State.  ACEF's members therefore are subject to the requirements for sales and production of eggs in California that were adopted by the citizens of California in Proposition 12 and codified in California Health and Safety Code §§ 25990-25993.1.  ACEF's principal purposes are to engage in advocacy regarding policies affecting the egg-farming industry and to ensure the continued production of fresh and affordable eggs that meet the food-safety and animal-care standards that consumers expect.

ACEF participated as a defendant-intervenor in a prior, similar Commerce Clause challenge to California Health and Safety Code § 25996, which prohibits the sale in California of eggs that the seller knows or should have known are the product of an egg-laying hen that was confined not in compliance with the animal-care standards contained in California Health and Safety Code § 25990.  ACEF also participated as an amicus curiae in another similar Commerce Clause challenge to California Health and Safety Code § 25996, filed as an original action in the United States Supreme Court.  ACEF is able to contribute a unique perspective in this case because of its prior experience in these cases and its knowledge of agricultural markets and regulation.

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person, other than amicus curiae or its members, made a monetary contribution intended to fund the preparation or submission of this brief.  The parties do not oppose the filing of this brief.

**INTRODUCTION**

Since 2008, California law has prohibited the confinement of certain farm animals—including egg-laying hens, calves raised for veal, and pregnant pigs—in cages too small to allow them to lie down, stand up, fully extend their limbs, or turn around freely.  In 2010, California banned the in-state sale of eggs derived from hens that were confined in such a manner, whether that confinement took place inside or outside of California.  Proposition 12, passed by California voters in November 2018, modified the various enclosure requirements and imposed a sales ban on veal and pork products derived from covered calves or pigs that were confined in the prohibited manner, again wherever that confinement took place.

On two prior occasions, other States have attempted to challenge California's in-state sales ban on eggs laid by hens confined in the prohibited manner, on the ground that the sales ban violated the dormant Commerce Clause. Both times, their attempts failed for lack of standing.  Now, Plaintiff North American Meat Institute has brought its own belated Commerce Clause challenge to Proposition 12's sales ban on the prohibited veal and pork products.[2]  This third attempt is as doomed as the first two.  Under well-established Supreme Court and Ninth Circuit precedent, a law that acts equally upon in-state and out-of-state actors and falls within the State's regulatory jurisdiction, as Proposition 12's sales ban does, is neither a protectionist measure nor an extraterritorial regulation.  And given the tangible local benefits of preventing animal cruelty and promoting consumer health, the local benefits here far outweigh any incidental burdens on commerce.

Indeed, controlling Ninth Circuit precedent forecloses all of Plaintiff's Commerce Clause arguments.  In *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013), the Ninth Circuit rejected

---

[2] Plaintiff does not challenge Proposition 12's application to eggs.

a Commerce Clause challenge to a California law that bans the in-state sale of foie gras that was produced in a specific, prohibited manner—no matter where that production took place.  In reaching that holding, the Ninth Circuit rejected all of the same arguments that Plaintiff attempts to advance here:  The court held that the law did not discriminate against interstate commerce or reflect economic protectionism; that it did not constitute extraterritorial regulation; and that any burden on interstate commerce did not outweigh the law's local benefits.  *Id.* at 947-52.  Given the strikingly similar facts of this case, this Court is bound to follow the holding of *Association des Eleveurs*.

## BACKGROUND

On November 6, 2018, Californians voted in favor of Proposition 12 by a margin of approximately 63% to 37%.[3]  The purpose of Proposition 12 was "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California."  Prop. 12 § 2.[4]  Proposition 12 modified California Health and Safety Code § 25990, effective December 19, 2018, to provide that:

> (1) a farm owner or operator in California "shall not knowingly cause any covered animal to be confined in a cruel manner" as defined by the statute, and

> (2) a business owner or operator "shall not knowingly engage in the sale within [California]" of:

---

[3] BALLOTPEDIA, California Proposition 12, Farm Animal Confinement Initiative (2018), https://ballotpedia.org/California_Proposition_12,_Farm_Animal_Confinement_Initiative_(2018).

[4] The full text of Proposition 12 can be found on pages 87-90 of the compilation of the text of the proposed laws submitted to California voters on November 6, 2018.  https://vig.cdn.sos.ca.gov/2018/general/pdf/topl.pdf#prop12.

(a) "[w]hole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner,"

(b) "[w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner,"

(c) "[s]hell egg[s] that the business owner or operator knows or should know is the product of a covered animal who was confined in a cruel manner," and

(d) "[l]iquid eggs that the business owner or operator knows or should know are the product of a covered animal who was confined in a cruel manner."

Proposition 12 also modified California Health and Safety Code § 25991 to amend a number of definitions. The term "[c]overed animal" is defined to mean "any calf raised for veal, breeding pig, or egg-laying hen who is kept on a farm." Cal. Health & Safety Code § 25991(f). The term "[c]onfined in a cruel manner" is defined to mean, as of December 19, 2018, "[c]onfining a covered animal in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely." *Id.* § 25991(e)(1). The definition also imposes specific enclosure-size requirements for different animals taking effect on different future dates. *See id.*[5]

Section 25990—which was modified by Proposition 12—had been adopted by California voters in 2008 as Proposition 2. Before its modification by Proposition 12, § 25990 provided that a person could not confine a covered animal (defined to include calves raised for veal, pregnant pigs, and egg-laying hens) in a manner that prevented the animal from "[l]ying down, standing up, [] fully extending his or her limbs[, and] [t]urning around freely."

---

[5] Section 9 of Proposition 12 set forth a severability provision applicable if "any provision of this act, or the application thereof to any person or circumstances, is held invalid or unconstitutional."

In 2010, the California Legislature enacted a law known as AB 1437—codified in California Health and Safety Code § 25996—that prohibits the sale in California of shell eggs "if the seller knows or should have known that the egg is the product of an egg-laying hen that was confined on a farm or place"—in the state or outside the state—"that is not in compliance with animal care standards set forth in Chapter 13.8 (commencing with Section 25990)." The Legislature enacted AB 1437 to promote food safety as well as animal welfare. Cal. Health & Safety Code § 25995.[6]

Proposition 12, enacted by California voters in 2018, has no legislative connection to § 25996 or AB 1437, which were adopted by the California legislature in 2010. Proposition 12 did not modify or refer to § 25996 in any way. Section 25996 remains on the books and is not at issue in this case. Proposition 12 also did not modify the California Department of Food and Agriculture's "Shell Egg Food Safety" regulation. *See* Cal. Code Regs. tit. 3, § 1350. That regulation imposes several requirements on egg producers and handlers, aimed at combating *Salmonella*.[7] Among other things, the regulation prohibits egg handlers and producers from "sell[ing] or contract[ing] to sell a shelled egg for human consumption in California" if it comes from a hen kept in an enclosure that does not provide a set minimum amount of space per hen. *Id.* § 1350(d).

---

[6] The Legislature expressly found that "[e]gg-laying hens subjected to stress are more likely to have higher levels of pathogens in their intestines" and that such "conditions increase the likelihood that consumers will be exposed to higher levels of food-borne pathogens" such as *Salmonella*. Cal. Health & Safety Code § 25995(c). It also noted that "*Salmonella* is the most commonly diagnosed foodborne illness in the United States." *Id.* § 25995(d); *see also id.* § 25995(e).

[7] *See* Dep't of Food & Agric., Shell Egg Food Safety: Initial Statement of Reasons 2 (July 2012) (noting that § 1350 is "intend[ed] to address the problem of the occurrence of Salmonella enteritidis (SE) contamination of shell eggs during egg production"), https://web.archive.org/web/20170201224432/http://www.cdfa.ca.gov/ahfss/pdfs/regulations/Shell_Egg_Food_Safety_ISR_July_2012.pdf.

1     AB 1437 and California's Shell Egg Food Safety regulation were the subject

2  of Commerce Clause challenges similar to the one asserted by Plaintiff here

3  against Proposition 12's veal and pork sales bans.  In 2014, a number of States

4  filed a lawsuit in the U.S. District Court for the Eastern District of California to try

5  to block AB 1437 and the Shell Egg Food Safety regulation from taking effect.

6  The States asserted the same Commerce Clause challenges raised in this case by

7  the veal and pork industries.  That lawsuit was dismissed for lack of standing.

8  *Missouri v. Harris*, 58 F. Supp. 3d 1059 (E.D. Cal. 2014).  The United States Court

9  of Appeals for the Ninth Circuit affirmed, and the U.S. Supreme Court declined

10  review.  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017), *cert.*

11  *denied sub nom. Missouri v. Becerra*, 137 S. Ct. 2188 (2017).

12     In 2017, many of the same States tried a new tactic.  They again filed a

13  Commerce Clause challenge to AB 1437 and California's Shell Egg Food Safety

14  regulation, but this time they did so directly in the U.S. Supreme Court, as an

15  original action, seeking to invoke the Court's jurisdiction over suits by one State

16  against another.   The Supreme Court declined to exercise jurisdiction to review

17  the challenge.  *See Missouri v. California*, 139 S. Ct. 859 (2019).

18     In the present action, Plaintiff challenges Proposition 12's prohibitions on

19  the sale of veal and pork in California, contending that the sales prohibitions:

20  (1) discriminate against out of state producers, (2) impermissibly regulate conduct

21  outside of California, and (3) impose substantial burdens on interstate commerce

22  that clearly outweigh California's valid state interests.  *See* Plaintiffs' Notice of

23  Motion and Motion for Preliminary Injunction at 7-23 (Dkt. No. 15) ("Mot.").

24  Plaintiff seeks a preliminary injunction.

## ARGUMENT

26     Plaintiff's Commerce Clause challenges to Proposition 12's veal and pork

27  sales bans are foreclosed by binding Ninth Circuit precedent and cannot proceed.

28

---

- 6 -                           AMICUS BRIEF ISO
DEFENDANTS' OPPOSITION TO
MOT. FOR PRELIM. INJ.

This Court should therefore conclude that Plaintiff is unlikely to succeed on the merits and deny the requested preliminary injunction.[8]

## I.   PROPOSITION 12 DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE

Under Supreme Court precedent, the so-called "dormant" Commerce Clause prohibits "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue v. Davis*, 553 U.S. 328, 337-38 (2008).  In other words, States may not "discriminat[e] between transactions on the basis of some interstate element." *Comptroller of Treasury of Maryland v. Wynne*, 135 S. Ct. 1787, 1794 (2015) (internal quotation marks omitted).  "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (internal quotation marks omitted); *see Rosenblatt v. City of Santa Monica*, __ F.3d __, No. 17-55879, 2019 WL 4867397, at *3 (9th Cir. Oct. 3, 2019) ("The primary purpose of the dormant Commerce Clause is to prohibit statutes that discriminate against interstate commerce by providing benefits to in-state economic interests while burdening out-of-state competitors." (internal quotation marks omitted)).

As a result, "laws that . . . treat every private business, whether in-state or out-of-state, exactly the same[ ]do not discriminate against interstate commerce for purposes of the Commerce Clause." *United Haulers*, 550 U.S. at 334.  "This is so even when only out-of-state businesses are burdened because there are no comparable in-state businesses." *Association des Eleveurs de Canards et d'Oies*

---

[8] ACEF confines its arguments to the likelihood-of-success-on-the-merits prong of the preliminary-injunction standard but does not concede that Plaintiff has satisfied the other requirements for obtaining such relief.

1   *du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (citing *Exxon Corp. v.*
2   *Governor of Maryland*, 437 U.S. 117, 119–20 (1978)).

3          Controlling Ninth Circuit precedent makes clear that Proposition 12 does not
4   discriminate against interstate commerce.  In *Association des Eleveurs*, the Ninth
5   Circuit rejected a Commerce Clause challenge to a law banning the sale in
6   California of foie gras produced using certain methods, no matter where it was
7   produced.  729 F.3d at 947-52.  The Court explained that the law's "economic
8   impact does not depend on *where* the items were produced, but rather *how* they
9   were produced."  *Association des Eleveurs*, 729 F.3d at 948.  Because the law at
10  issue "bans the sale of both intrastate and interstate products that are the result of
11  force feeding a bird, it is not discriminatory."  *See id.* (citing *Pac. Nw. Venison*
12  *Producers v. Smitch*, 20 F.3d 1008, 1012 (9th Cir. 1994) ("An import ban that
13  simply effectuates a complete ban on commerce in certain items is not
14  discriminatory, as long as the ban on commerce does not make distinctions based
15  on the origin of the items."), and *Empacadora de Carnes de Fresnillo, S.A. de C.V.*
16  *v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007) (holding that a statute that "treats both
17  intrastate and interstate trade of horsemeat equally by way of a blanket
18  prohibition" cannot be "considered economic protectionism")).

19          Since its decision in *Association des Eleveurs*, the Ninth Circuit has on at
20  least two other occasions rejected similar Commerce Clause challenges.  In
21  *Rosenblatt*, decided earlier this month, the Ninth Circuit found that a city's ban on
22  short-term vacation rentals did not "discriminate[] against out-of-state interests"
23  and did not violate the dormant Commerce Clause where the ban "applie[d] in the
24  same manner to persons nationwide."  __ F.3d at __, 2019 WL 4867397, at *8.
25  And in *Pharmaceutical Research & Manufacturers. of America v. County of*
26  *Alameda*, 768 F.3d 1037, 1040 (9th Cir. 2014), the Ninth Circuit addressed a
27  county ordinance requiring that prescription drug manufacturers who "sell, offer
28

for sale, or distribute" certain drugs within the county operate a program providing

for the collection and disposal of those drugs when unwanted.  Rejecting the

argument of out-of-state drug manufacturers that the ordinance was

"indistinguishable from a tariff," the court held that because the ordinance

"applie[d] to all manufacturers that make their drugs available in Alameda

County—without respect to the geographic location of the manufacturer"—it did

"not discriminate at all, let alone in the same way as a tariff."  *Id.* at 1042.

This case is on all fours with *Association des Eleveurs* and is similarly

controlled by the rule reaffirmed in *Rosenblatt* and *Pharmaceutical. Research &*

*Manufacturers*.  Proposition 12's sales ban, just like the sales ban at issue in

*Association des Eleveurs*, treats in-state and out-of-state entities "exactly the same"

and therefore does not discriminate against interstate commerce.  *See Association*

*des Eleveurs*, 729 F.3d at 948 (quoting *United Haulers*, 550 U.S. at 338).  The law

restricts California businesses from selling pork or veal that was the product of an

animal that was "confined in a cruel manner," regardless of whether such

confinement took place inside or outside of California.  Thus, just as in *Association*

*des Eleveurs*, the "economic impact" of Proposition 12 "does not depend on *where*

the items were produced, but rather *how* they were produced."  *Id.*  Because

Proposition 12 "bans the sale of both intrastate and interstate products that are the

result of [the restricted caging practices], it is not discriminatory."  *Id.*

In arguing to the contrary, Plaintiff concedes (Mot. 9) that Proposition 12 is

"facially neutral" but insists that Proposition 12's sales ban is unlawful because it

neutralizes a "competitive advantage" (Mot. 10) that out-of-state meat producers

allegedly would otherwise enjoy over in-state producers.  That advantage, Plaintiff

explains, is the result of Proposition 12's separate provision prohibiting in-state

producers from confining pigs or calves in the specified "cruel manner."  Yet the

same facts were present in *Association des Eleveurs*, in which California banned

both the in-state *production* of foie gras using the prohibited methods and the in-state *sale* of foie gras that had been so produced, wherever it was produced. 729 F.3d. at 949. The Ninth Circuit there correctly found that the sales ban was not a protectionist regulation, and Plaintiff does not even attempt to distinguish that controlling precedent.[9]

Moreover, accepting Plaintiff's reasoning yields counterintuitive conclusions. In focusing on the "competitive advantage" that Proposition 12's in-state production ban allegedly would have created for out-of-state producers if it had been enacted on its own, Plaintiff essentially argues that Proposition 12's facially neutral sales ban is rendered discriminatory protectionism by a companion provision that imposes a burden only on in-state businesses. Thus, on Plaintiff's view, Proposition 12 apparently would have been lawful if it had imposed only a sales ban on meat produced both in-state and out-of-state, but somehow discriminates against out-of-state businesses as a result of its additional restriction on *in-state businesses*. Plaintiff cites no precedent that would support such a strange conclusion, and *Association des Eleveurs* forecloses it.

The precedent Plaintiff does cite misses the mark. In *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), a case decided over 80 years ago, the Supreme Court addressed a New York statute that banned milk dealers from selling milk that was purchased from a milk producer outside New York for a price lower than the minimum price permitted to be paid to milk producers in New York. *See id.* at 519. The Court invalidated the law on the ground that it was tantamount to a duty on interstate commerce. *Id.* at 521-22. Similarly, in *West Lynn Creamery v.*

---

[9] All Plaintiff says about *Association des Eleveurs* in this section of its memorandum is that the case "did not hold that a facially neutral sales ban is immune from Commerce Clause challenge based on its protectionist purpose or effect." Mot. 10 n.5. That is, of course, true—but Plaintiff nowhere explains why, given that the Ninth Circuit found no protectionist purpose or effect in *Association des Eleveurs*, there could be one here.

*Healy*, 512 U.S. 186 (1994), the Court addressed a Massachusetts law taxing all milk sold to Massachusetts retailers—about two-thirds of which was produced out of state—and redirecting the proceeds of the tax to in-state dairy farmers. *See id.* at 188. The Court held that the law unconstitutionally discriminated against interstate commerce because it operated as a tax on out-of-state milk. *Id.* at 189. Thus, both *Baldwin* and *West Lynn Creamery* involved state laws that effectively imposed taxes on interstate commerce for the purpose of protecting in-state entities. By contrast, Proposition 12 imposes no financial burden on any interstate transaction but rather enacts a ban on the *in-state* sale of certain goods, no matter where they were produced, if they were produced according to certain methods.

Plaintiff also relies on *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), but that case is inapposite as well. In *Hunt*, the Court struck down a North Carolina law prohibiting the display of any grade other than the federal grade on certain containers of apples, because the law effectively discriminated against interstate sales of apples from the state of Washington in a number of respects. *Id.* at 350-52. The law, the Court explained, "rais[ed] the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected." *Id.* at 351. The law also "ha[d] the effect of stripping away from the Washington apple industry the competitive and economic advantages it ha[d] earned for itself," while having "no similar impact on the North Carolina apple industry." *Id.* Finally, the law had "a leveling effect which insidiously operate[d] to the advantage of local apple producers," because it eliminated "a distinct market advantage" that "Washington sellers would normally enjoy" "with free market forces at work." *Id.* at 351-52. In other words, the law at issue sought to negate an earned, free-market advantage enjoyed by out-of-state sellers, including by raising their costs while keeping costs flat for in-state producers. Proposition 12 does no

1  such thing:  It imposes a production ban on *in-state* entities, while also imposing an

2  in-state sales ban that applies equally to both in-state and out-of-state entities.[10]

3       Finally, Plaintiff's arguments (*see* Mot. 7-8) find no support in the

4  legislative history of AB 1437, the 2010 California law (codified in California

5  Health and Safety Code § 25996) that prohibits the sale in California of shell eggs

6  "if the seller knows or should have known that the egg is the product of an egg-

7  laying hen that was confined on a farm or place"—in the state or outside the

8  state—"that is not in compliance with animal care standards set forth in … Section

9  25990."  Proposition 12, enacted *by California voters in 2018*, has no legislative

10  connection to § 25996 or AB 1437, adopted *by the California legislature in 2010*.

11  Proposition 12 did not modify or refer to § 25996 in any way, and there is no basis

12  to consider the legislative history of AB 1437 in connection with Proposition 12.

13       Even if the legislative history of AB 1437 were somehow relevant here,

14  moreover, it would not support Plaintiff's contention.  The stated purpose of AB

15  1437 was preventing *Salmonella* contamination.  *See* AB 1437, § 1 (codified at Cal.

16  Health & Safety Code § 25995(c)).  It is well settled that courts "will 'assume that

17  the objectives articulated by the legislature are actual purposes of the statute, unless

18  an examination of the circumstances forces [them] to conclude that they *could not*

19  *have been* a goal of the legislation.'"  *Rocky Mountain Farmers Union v. Corey*, 730

20  F.3d 1070, 1097-98 (9th Cir. 2013) (quoting *Minnesota v. Clover Leaf Creamery*

21

22

23

24  ———————————

     [10] Plaintiff asserts in passing that Proposition 12 discriminated against out-
     of-state producers by giving them less time to comply with the "turnaround"
25   standard (*see* Mot. 10), but Plaintiff does not contend that the "turnaround"
     standard has caused its members any injury.  The veal producers appear to be
26   already in compliance, *see, e.g.*, Bakke Decl. ¶ 5 (Dkt. 15-3), and the pork
     producers contend either that the standard does not yet apply or that they fall
27   within an exception, *see infra* n.17.

28

1    *Co.*, 449 U.S. 456, 463 n.7 (1981) (emphasis added)).[11]  The California Legislature's

2    findings in AB 1437 regarding food safety (*see infra* at 24) more than suffice to

3    demonstrate that protecting public health "could … have been a goal of the

4    legislation."  *Rocky Mountain Farmers*, 730 F.3d at 1097-1098.  The lone Assembly

5    committee report Plaintiff relies on (*see* Mot. 3, 8)—which was never approved by a

6    majority of even one chamber of the Legislature—cannot trump the clear statement

7    of purpose in AB 1437 approved by majorities of both.[12]

8         In sum, Plaintiff's argument that Proposition 12 is a protectionist measure

9    that discriminates against interstate commerce is foreclosed by *Association des*

10   *Eleveurs*, and none of Plaintiff's arguments comes close to calling the Ninth

11   Circuit's reasoning in that case into question.

12   **II.**    **PROPOSITION 12 DOES NOT REGULATE EXTRATERRITORIALLY**

13        Controlling Ninth Circuit precedent, including *Association des Eleveurs*,

14   also forecloses Plaintiff's claim that Proposition 12 is unconstitutional

15   extraterritorial regulation.  As the Ninth Circuit made clear earlier this year, "States

16   may seek to influence which products are sold in-state, distinguishing

17   impermissible statutes that regulate out-of-state parties directly from those that

18   regulate[] contractual relationships in which at least one party is located in [the

19   regulating state]."  *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 952

20   (9th Cir. 2019) (internal quotation marks omitted).  In addition, "[t]he Commerce

21

22       [11] *Clover Leaf Creamery* illustrates the principle:  The Supreme Court
   rejected the challengers' "discriminatory purpose" argument *despite* the district

23   court's having made a "finding" that the law's "actual basis was to promote the
   economic interest of" certain local industries, not its stated environmental

24   objectives.  449 U.S. at 471 n.15 (internal quotation marks omitted).

25       [12] *See also Clover Leaf Creamery*, 449 U.S. at 463 n.7 ("We will not
   invalidate a state statute under the Equal Protection Clause merely because some

26   legislators sought to obtain votes for the measure on the basis of its beneficial side

27   effects on state industry."); *id.* at 470 n.14 (noting "obvious factual connection
   between the rationality analysis under the Equal Protection Clause and the

28   balancing of interests under the Commerce Clause").

1   Clause also does not treat regulations that have upstream effects on how sellers

2   who sell to California buyers produce their goods as being necessarily

3   extraterritorial." *Id.* (citing *Clover Leaf Creamery*, 449 U.S. at 472; *Exxon Corp.*,

4   437 U.S. at 125-28).  And "states may regulate to minimize the in-state harm

5   caused by products sold in-state, a central aspect of the state sovereignty protected

6   by the Constitution."  *Id.* (citing *Clover Leaf Creamery*, 449 U.S. at 471-74; *Sam*

7   *Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324 (9th Cir. 2015) (en banc)).

8        The Ninth Circuit applied these principles in *Association des Eleveurs* to

9   reject a constitutional challenge to a law that, as described above, is similar in all

10  material respects to Proposition 12.  As the court explained, the ban on sales of foie

11  gras produced by force feeding birds "applies to both California entities and out-

12  of-state entities and precludes sales within California of products produced by

13  force feeding birds regardless of where the force feeding occurred."  *Association*

14  *des Eleveurs*, 729 F.3d at 949.  For that reason, the law was not "aimed at" out-of-

15  state entities and was not impermissible extraterritorial regulation.  The same is

16  true of Proposition 12, which applies equally to both in-state and out-of-state

17  entities and does not "regulate out-of-state parties directly" but instead, in

18  restricting in-state sales, "regulat[es] contractual relationships in which at least one

19  party is located in" California.  *Rocky Mountain Farmers*, 913 F.3d at 952.

20       Plaintiff attempts to distinguish *Association des Eleveurs* on the ground that

21  its challenge here "involves concerns about protectionism that were not present in

22  *Association des Eleveurs*."  Mot. 18.  Yet Plaintiff never articulates what those

23  supposed concerns are.  As described above, *see supra* at pp. 7-13, this case does

24  not involve protectionism and is on all fours with *Association des Eleveurs*.

25       Plaintiff also argues that *Association des Eleveurs* wrongly rejected the

26  reliance by the plaintiffs in that case on the Supreme Court's decision in *Baldwin*

27  and its later decision in *Healy v. Beer Inst.*, 491 U.S. 324 (1989)—both of which

28

Plaintiff here emphasizes heavily.  *Baldwin*, as described above, was a price-fixing case in which New York State sought to influence the prices at which milk was sold out of state by restricting in-state sales.  294 U.S. at 519.  The Supreme Court struck down the law on the ground that it had the effect of establishing a price scale for use in other states.  *Healy* was similar:  The Court struck down a Connecticut "price affirmation" law that required "out-of-state shippers [of beer to] affirm that their prices [we]re no higher than the prices being charged in the border States as of the moment of affirmation."  491 U.S. at 335.  In *Association des Eleveurs*, the Ninth Circuit correctly noted that both of those prior cases involved "price control or price affirmation statutes," and the Ninth Circuit rejected the plaintiffs' reliance on those cases because the foie gras law at issue in *Association des Eleveurs* did not "impose any prices for duck liver products and does not tie prices for California liver products to out-of-state prices."  729 F.3d at 951.  Here, too, of course, Proposition 12 does not impose prices and does not tie prices for California products to out-of-state prices.  Thus, *Association des Eleveurs* is controlling as to this point as well.

Plaintiff argues that other Ninth Circuit and Supreme Court cases have expanded the price-fixing doctrine of *Baldwin* and *Healy* beyond the facts of those cases, but any such expansion—if there has been any at all—clearly does not reach this case.  First of all, the Supreme Court has strongly implied that *Baldwin* and *Healy* are indeed limited to the price-fixing context.  In *Pharmaceutical. Research & Manufacturers. of America. v. Walsh*, 538 U.S. 644, 669 (2003), the Court rejected an extraterritoriality challenge to a Maine law that out-of-state drug manufacturers argued impermissibly regulated transactions taking place wholly outside the state—namely, those between the drug manufacturer and a wholesaler who would then distribute the drugs to Maine pharmacies.  *Id.* at 649, 669.  Noting that Maine's law did not "regulate the price of any out-of-state transaction, either

1   by its express terms or by its inevitable effect," the Court held that "[t]he rule that

2   was applied in *Baldwin* and *Healy* accordingly is not applicable in this case." *Id.* at

3   669.

4       It is true that two recent Ninth Circuit cases have cited *Healy* (though not

5   *Baldwin*) in striking down certain state statutes with extraterritorial effect outside

6   of the price-fixing context. *See Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608,

7   614-15 (9th Cir. 2018); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320,

8   1323-24 (9th Cir. 2015). But whatever the interaction between those cases and the

9   binding authority in *Walsh*, neither affects the outcome here. Unlike this case (and

10  *Association des Eleveurs*), *Daniels* and *Sam Francis* involved laws that regulated

11  conduct or transactions that took place "wholly" outside of California. *Daniels*,

12  889 F.3d at 615 ("[W]e are faced with an attempt to reach beyond the borders of

13  California and control transactions that occur wholly outside of the State."); *Sam*

14  *Francis*, 784 F.3d at 1324 (noting that the case "involve[d] regulation of wholly

15  out-of-state conduct."). Indeed, both *Daniels* and *Sam Francis* explicitly

16  distinguished and left in place the holding in *Association des Eleveurs*. *Daniels*,

17  889 F.3d at 615 ("We are not concerned here with an attempt by the Department

18  officials to protect California and its residents by applying the [law] to products

19  that are brought into or are otherwise within the borders of the State." (citing

20  *Association des Eleveurs*, 729 F.3d at 949)); *Sam Francis*, 784 F.3d at 1324

21  ("Cases such as [*Association des Eleveurs*] do not apply here. Unlike this case—

22  which involves regulation of wholly out-of-state conduct—[*Association des*

23  *Eleveurs*] concerned state laws that regulated *in-state conduct* with allegedly

24  significant out-of-state practical effects.").

25      Thus, it is irrelevant to this case whether the Supreme Court in *Walsh* in fact

26  limited the rule of *Baldwin* and *Healy* to just the price-fixing context, because

27

28

1    Plaintiff can cite no controlling authority that has applied the extraterritoriality rule

2    of those cases to invalidate a law even remotely similar to Proposition 12.

3         Plaintiff also argues that Proposition 12 exceeds California's police power

4    because, according to Plaintiff, "the *only* harms the ban seeks to prevent" "are

5    outside California's borders." Mot. 17-18. This is incorrect: The Official Voter's

6    Information Guide for Proposition 12 laid out the public-health concerns that the

7    Proposition was designed to address—as Plaintiff acknowledges (Mot. 12 n.8).

8    *See infra* at 24. Moreover, Proposition 12 itself states that it aims "to prevent

9    animal cruelty by phasing out extreme methods of farm animal confinement,"

10   Prop. 12 § 2, and the Ninth Circuit in *Association des Eleveurs* held that a similar

11   sales ban served to promote a local interest even as applied to sales of out-of-state

12   products. 729 F.3d at 952 (finding it sufficient that "the State believed that the

13   sales ban in California may discourage the consumption of products produced by

14   force feeding birds and prevent complicity in a practice that it deemed cruel to

15   animals"). Thus, any suggestion that Proposition 12 exceeds California's

16   regulatory power must be rejected.[13]

17        Plaintiff also argues that Proposition 12 poses a risk of "balkanization" that

18   could be realized if every State imposed its own version of an animal-confinement

19   rule. But, as Plaintiff acknowledges, the Ninth Circuit in *Association des Eleveurs*

20   rejected just such a concern as "mere speculation" where the record reflected only

21

22        [13] For this reason, Plaintiff's reliance on *C & A Carbone, Inc. v. Town of

23   Clarkstown*, 511 U.S. 383, 386-87 (1994), is misplaced. In *Carbone*, the Supreme

24   Court addressed a town ordinance that attempted "to steer solid waste away from

     out-of-town disposal sites that [the town] deem[ed] harmful to the environment,"

25   and toward the town's privately operated transfer station. *Id.* at 391. The Court

     invalidated the law because it sought to "extend the town's police power beyond its

26   jurisdictional bounds." *Id.* at 393. Because California clearly has jurisdictional

     control over the products sold within the State, *Carbone* does not apply here. *See

27   Osborn v. Ozlin*, 310 U.S. 53, 62 (1940) ("The mere fact that state action may have

     repercussions beyond state lines is of no judicial significance so long as the action

28   is not within the domain which the Constitution forbids.").

one other similar ordinance that had been enacted anywhere in the nation (and it was later repealed).  729 F.3d at 951.  Here, Plaintiff cites just one other arguably comparable animal-confinement statute: a Massachusetts law enacted in 2016. Mot. 19.  With just one additional like statute in the entire nation, a risk of balkanization is nearly as remote and just as speculative as it was in *Association des Eleveurs*.  Moreover, even if other States do impose similar laws, it is highly unlikely that those laws ever would be *conflicting*, as opposed to just inconsistent in scope, with Proposition 12.  That is, if more States enact confinement requirements, they will be minimum-space requirements, not maximum-space requirements that could conflict with Proposition 12's minimum-space requirements.  Absent any plausible likelihood of conflicting legislation, there is no basis for invalidating Proposition 12 based on the speculative possibility that other States will enact their own animal-confinement laws.  *See S.D. Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 470-71 (9th Cir. 2001) ("Because Myers has not brought to our attention any actual or pending legislation that conflicts or would conflict with the Ordinance, we uphold the Ordinance against Myers's facial attack under the Commerce Clause.").

Finally, this Court owes no consideration to the parade of horribles that Plaintiff claims will result from rejection of its constitutional claim.  Upholding Proposition 12 would not pave the way for laws banning "the sale of goods produced by companies that pay their workers less than California's minimum wage, that do not afford 'humane' family leave, or whose boards lack a California-specified level of gender balance."  Mot. 19.  This Court and others can decide such cases if they ever arise; their outcomes are not foreordained by this case, which involves only a geographically neutral sales ban on products made via a particular production method.  More importantly, because the outcome of *this* case is

controlled by *Association des Eleveurs* and other binding precedent, this Court need go no further in its analysis.

### III.    PLAINTIFF'S *PIKE* CLAIM IS FORECLOSED BY *ASSOCIATION DES ELEVEURS*

Nondiscriminatory state laws are subject to a less rigorous form of dormant Commerce Clause analysis: so-called *Pike* balancing.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  That balancing test asks whether "the burden imposed on commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142. Plaintiff's challenge to Proposition 12 under *Pike* is directly foreclosed by the Ninth Circuit's decision in *Association des Eleveurs*, which rejected the same argument with respect to the foie gras sales ban at issue there.

As an initial matter, judicial review under *Pike* is highly deferential.  The Supreme Court has warned against judicial second-guessing under *Pike* of quintessentially legislative judgments.  *See Davis*, 553 U.S. at 353 ("[T]he Judicial Branch is not institutionally suited to draw reliable conclusions of the kind that would be necessary for the Davises to satisfy a *Pike* burden in this particular case."); *United Haulers*, 550 U.S. at 347 (opinion of Roberts, C.J., joined by Souter, Ginsburg, and Breyer, JJ.) (rejecting "invitations to rigorously scrutinize economic legislation passed under the auspices of the police power" under the *Pike* balancing test); *id.* at 360 (Scalia, J., concurring in part).  Indeed, "a number of [the Supreme Court's] cases purporting to apply the *Pike* balancing test really turned on the discriminatory character of the challenged regulations." *National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1150 (9th Cir. 2012) (citing *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997)), *cert. denied*, 133 S. Ct. 1241 (2013).[14]  The last Supreme Court decision to find a *Pike* violation, *Bendix*

---

[14] In *Tracy*, the Supreme Court identified only two cases—both of which long predated *Pike*—in which it had "invalidated state laws under the dormant Commerce Clause that appear to have been genuinely nondiscriminatory." 519

1   *Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888 (1988), involved an

2   Ohio tolling statute that, in the Court's own words, "might have been held to be a

3   discrimination that invalidates without extended inquiry." *Id.* at 891; *see also id.* at

4   898 (Scalia, J., concurring in judgment) (noting that the law was "on its face

5   discriminatory because it applies only to out-of-state corporations"). In fact, *Pike*

6   itself involved a discriminatory law. *See C & A Carbone*, 511 U.S. at 392 (citing

7   *Pike*, 397 U.S. at 142).

8        Here, the Ninth Circuit's decision in *Association des Eleveurs* establishes that

9   non-discriminatory laws similar to Proposition 12 raise no concerns under *Pike*.

10  The Court there explained that a party challenging a statute under *Pike* "must first

11  show that the statute imposes a substantial burden before the court will 'determine

12  whether benefits of the challenged laws are illusory.'" *Association des Eleveurs*,

13  729 F.3d at 951-52 (quoting *Nat'l Ass'n of Optometrists*, 682 F.3d at 1155). As

14  explained below, Plaintiff has not alleged facts demonstrating either that Proposition

15  12 imposes a substantial burden on commerce or that any such burden "clearly"

16  outweighs the benefits of the law.

17        **A.    Proposition 12 Imposes No Substantial Burden**

18        The Court in *Association des Eleveurs* found no "substantial burden" on

19  interstate commerce for several reasons that are equally applicable here:

20        First, the Court explained that "most statutes that impose a substantial burden

21  on interstate commerce do so because they are discriminatory." 729 F.3d at 952.

22  But the Court concluded that the foie gras statute was not discriminatory. *Id.* The

23  same is true here, as explained above. Proposition 12's sales ban treats in-state and

24  out-of-state producers equally. All producers must satisfy California's requirements

25  if they wish to sell their products in California.

26

27  U.S. at 298 n.12. Both of those cases involved interstate transportation, which has

28  a "compelling need for national uniformity in regulation." *Id.*; *see Association des
    Eleveurs*, 729 F.3d at 952.

Second, a statute can "impose significant burdens on interstate commerce as a consequence of inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Association des Eleveurs*, 729 F.3d at 952 (internal quotation marks omitted).  The Court gave as examples of inherently national activities "transportation or professional sports league[s]." *Id.* (internal quotation marks omitted).[15]  The plaintiffs there thus could not show that the foie gras market required a "uniform system of regulation." *Id.*  Likewise, Plaintiff cannot show a significant burden here.  There is no need for national uniformity in the types of veal and pork that can be sold in each state or the manner in which veal and pork are produced at the farm level.  Indeed, Plaintiff does not argue that federal law preempts Proposition 12.  If Congress were concerned about differential state standards, it would and could act.  Pork and veal products are not like a truck that must pass through multiple states and cannot feasibly be subjected to different regulations by each.  If producers wish to sell their products in California, they can produce them in compliance with California's standards.[16]

Third, the Court in *Association des Eleveurs* noted that the statute at issue would not entirely bar foie gras production but would instead preclude just one method of production for California-bound foie gras.  729 F.3d at 952; *id.* at 949-50 ("Plaintiffs have not shown that the effect of § 25982 is a complete import and sales ban on foie gras."); *id.* at 949 ("Section 25982 only precludes a more profitable method of operation—force feeding birds for the purpose of enlarging its liver—

---

[15] *See also Pacific Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1014 (9th Cir. 1994) ("This is not a matter in which national uniformity is important. Most states and Canadian provinces ban some species of wildlife, and the lists of prohibited species vary widely.").

[16] For eggs, there is already a significant volume of cage-free production in the United States.  Over 20% of egg-laying hens are housed in a cage-free system. *See* Ibarburu, *U.S. Flock Trends and Projections* at 7, Egg Industry Center (Oct. 4, 2019).

rather than affecting the interstate flow of goods." (quoting the district court)).  That is also the case here.  Plaintiff does not argue that California's confinement standards will prevent the production of veal and pork.  It argues only that compliance with Proposition 12's standards will be costly.  Mot. 20-21.[17]  But the fact that complying with those standards might increase costs is of no moment.  As the Court explained in *Association des Eleveurs*, a statute that merely "preclude[s] Plaintiffs' 'more profitable' method of produc[tion]" of items bound for California does not violate the Commerce Clause.  729 F.3d at 952.  This is particularly true given that Plaintiff itself alleges that "[m]uch of these increased costs are likely to be passed through to consumers who purchase the products."  Compl. ¶ 40 (quoting the Legislative Analyst's Office's report on Proposition 12).[18]  If California consumers choose (through voting in favor of Proposition 12) to pay producers to adhere to higher standards for California-bound products, that is their prerogative.

   For all of these reasons, Proposition 12—like the foie gras law at issue in *Association des Eleveurs*—does not substantially burden interstate commerce.  That is sufficient under *Association des Eleveurs* to foreclose Plaintiff's claim.

---

[17] Notably, Plaintiff has not asserted that pork producers are *currently* spending *any* money to comply with Proposition 12's "turnaround" standard.  Plaintiff suggests instead either that the "turnaround" standard is not "currently in effect" (for unexplained reasons) or that "statutory exceptions" apply.  Mot. 24; *see* Renells Decl. ¶ 9 (Dkt. 15-9) ("Subject to certain statutory or potential regulatory exceptions, Clemens *may* be required to eliminate the crates in which breeding sows are housed during the insemination process." (emphasis added)); Turner Decl. ¶ 7 (Dkt. 15-10) (same); Darrell Decl. ¶ 10 (Dkt. 15-7) ("Smithfield *may* be required to eliminate the stalls in which sows are housed during the insemination process …." (emphasis added)); Neff Decl. ¶ 4 (Dkt. 15-8) (noting that not all independent farmers currently meet the 24-square-foot requirement that will apply January 1, 2022).  It is therefore questionable whether pork producers are suffering any current harm.

[18] *See also* Br. for Ass'n of Cal. Egg Farmers as Amicus Curiae ISO Def. 11, *Missouri v. California*, No. 22O148 (Mar. 2018 U.S.) (noting that higher prices in California "reflect the cost of producing eggs to California's standards." (citing an economic report by agricultural economist Brian Wright)).

## B.     The Benefits of Proposition 12 Are Significant

Even if Proposition 12 imposed some burden, the burden would not be "clearly excessive" in relation to the benefits of Proposition 12.  Plaintiff insists that Proposition 12 does not produce "*any* legitimate local benefits," Mot. 20 (emphasis in original), asserting that "there is not even a colorable showing that the sales ban advances any legitimate local interest," *id.* at 22 (internal quotation marks omitted).  Plaintiff further argues that "California has no legitimate *local* interest in regulating farming conditions in other States and countries, or in preventing California consumers from buying wholesome imported meats produced under conditions California disfavors."  *Id.*  But these assertions disregard the Ninth Circuit's controlling decision in *Association des Eleveurs*—which Plaintiff does not even address as part of this analysis.

The Court in *Association des Eleveurs* concluded that the law at issue there furthered a "legitimate state purpose" despite the foie-gras producers' argument that "precluding sales of products produced by force feeding birds 'does nothing' to prevent animal cruelty in California."  729 F.3d at 952.  The Court found it sufficient that "the State believed that the sales ban in California may discourage the consumption of products produced by force feeding birds and prevent complicity in a practice that it deemed cruel to animals."  729 F.3d at 952.  Here, Proposition 12 serves the same purpose—"to prevent animal cruelty by phasing out extreme methods of farm animal confinement."  Prop. 12 § 2.  Under *Association des Eleveurs*, the State's interest in preventing animal cruelty is sufficient to outweigh any minimal burdens that Proposition 12 might impose.

Plaintiff also contends that California cannot substantiate any food safety benefits from Proposition 12's regulation of veal and pork.  *See* Mot. 22.  Notably, Plaintiff does not dispute that protecting public health is a legitimate state purpose.  *See, e.g.*, *Maine v. Taylor*, 477 U.S. 131, 152 (1986).  It simply questions whether

Proposition 12 does so.  On its face, Proposition 12 provides that the methods of confinement it prohibits "threaten the health and safety of California consumers, and increase the risk of foodborne illness."  Prop. 12 § 2.  Moreover, as Plaintiff concedes (Mot. 12 n.8), the Official Voter's Information Guide for Proposition 12 explained the increased risk from traditional cages for egg-laying hens:

> In the past decade, there have been recalls of nearly a billion eggs from caged chickens because they carried deadly *Salmonella*. Scientific studies repeatedly find that packing animals in tiny, filthy cages increases the risk of food poisoning.  Even *Poultry World*, a leading egg industry publication admitted, "*Salmonella* thrives in caged housing."

California General Election, Tuesday, Nov. 6, 2018, Official Voter Information Guide at 70, https://vig.cdn.sos.ca.gov/2018/general/pdf/complete-vig.pdf.

The California Legislature similarly concluded that traditional confinement of egg-laying hens raises health and safety concerns.  In 2010, the Legislature made detailed findings about AB 1437's public health purpose.  It concluded that "[e]gg-laying hens subjected to stress are more likely to have higher levels of pathogens in their intestines" and that such "conditions increase the likelihood that consumers will be exposed to higher levels of food-borne pathogens" such as *Salmonella*.  Cal. Health & Safety Code § 25995(c).  The Legislature thus declared its "intent" in enacting AB 1437: to "protect California consumers from the deleterious, health, safety, and welfare effects of the sale and consumption of eggs derived from egg-laying hens that are exposed to significant stress and may result in increased exposure to disease pathogens including salmonella."  *Id.* § 25995(e).  In reaching this conclusion, the Legislature relied on scientific studies.  *See* AB 1437, § 1.[19]

---

[19] *See, e.g.*, Pew Commission on Industrial Farm Animal Production, *Putting Meat on the Table: Industrial Farm Animal Production in America* 13 (2008) (finding that "the scale and methods common to [Industrial Farm Animal Production ("IFAP")] can significantly affect pathogen contamination of consumer food products"), https://www.pewtrusts.org/-

1    In the instant case, Plaintiff disputes that the veal and pork provisions of
2  Proposition 12 further an interest in health and safety. *See* Mot. 22; *see also id.* at
3  13. Plaintiff's own expert, however, concedes that "some scientific reviews have
4  suggested that food safety risks may be associated with housing." Belk Decl. ¶ 12
5  (Dkt. 15-2). The expert dismisses those reviews solely because they were not
6  "randomized controlled studies." *Id.* But under the deferential review applicable
7  here, there is no requirement that Proposition 12 find support in the kind of clinical
8  trial-type studies that would be demanded by the FDA in the drug-approval context.
9  *See Association des Eleveurs*, 729 F.3d at 953 (observing that the Supreme Court
10 "has frequently admonished that courts should not second-guess the empirical
11 judgments of lawmakers concerning the utility of legislation." (internal quotation
12 marks omitted)). Regardless, as explained above, Proposition 12's animal welfare
13 benefits are sufficient to sustain the law. The Ninth Circuit so held in *Association*
14 *des Eleveurs*, where no food safety basis for the legislation was even asserted. *Id.* at
15 952. Accordingly, Plaintiff's challenge to Proposition 12's veal and pork sales ban
16 under *Pike* fails at both steps of the inquiry.

## CONCLUSION

This Court should deny Plaintiff's motion for a preliminary injunction.

Dated: October 28, 2019                     Respectfully submitted,

                                            WILMER CUTLER PICKERING
                                              HALE AND DORR LLP

                                            /s/ Brian M. Boynton

                                            Brian M. Boynton (SBN 222193)
                                            brian.boynton@wilmerhale.com
                                            WILMER CUTLER PICKERING
                                              HALE AND DORR LLP

/media/legacy/uploadedfiles/phg/content_level_pages/reports/pcifapfinalpdf.pdf;
*see also id.* at 6 (IFAP includes "gestation and farrowing crates in swine
production [and] battery cages for egg-laying hens").

1875 Pennsylvania Ave. NW
Washington, DC 20006
Tel.: (202) 663-6044
Fax: (202) 663-6363

Matthew Tymann (SBN 326249)
matthew.tymann@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
50 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Tel.: (213) 443-5343
Fax: (213) 443-5400

*Attorneys for Amicus Curiae
Association of California Egg
Farmers*