1   Paul J. Zidlicky (*pro hac vice*)
2   pzidlicky@sidley.com
    Eric D. McArthur (*pro hac vice*)
3   emcarthur@sidley.com
    SIDLEY AUSTIN LLP
4   1501 K Street NW
    Washington, DC 20005
5   Tel: (202) 736-8000
6   Fax: (202) 736-8711

7   Sean A. Commons, SBN 217603
    scommons@sidley.com
8   SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000
9   Los Angeles, CA 90013
    Tel: (213) 896-6000
10  Fax: (213) 896-6600

11  *Attorneys for Plaintiff*

12              **UNITED STATES DISTRICT COURT**

13        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15  NORTH AMERICAN MEAT INSTITUTE,    | Case No. 2:19-cv-08569-CAS (FFMx)

16                   Plaintiff,       | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**
    v.
17

18  XAVIER BECERRA, in his official   | The Honorable Christina A. Snyder
    capacity as Attorney General of California,
19  KAREN ROSS, in her official capacity as   | Date:      November 18, 2019
    Secretary of the California Department of  | Time:      10:00 a.m.
20  Food and Agriculture, and SUSAN   | Location:  Courtroom 8D
    FANELLI, in her official capacity as Acting
21  Director of the California Department of
    Public Health,                    | Complaint filed: October 4, 2019
22

23                   Defendants.

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

REPLY BRIEF ...................................................................................................... 1

I.  The Meat Institute Is Likely To Prevail On The Merits ............................ 2

    A.  The Meat Institute Has Standing ................................................... 2

    B.  Proposition 12's Sales Ban Is A Protectionist Trade Barrier ........ 3

    C.  Proposition 12's Sales Ban Regulates Extraterritorial
        Commerce. .................................................................................... 9

    D.  Proposition 12's Sales Ban Excessively Burdens Interstate
        Commerce. .................................................................................. 14

II.  Proposition 12 Will Irreparably Harm The Meat Institute's
     Members. ................................................................................................ 19

III. The Equities And The Public Interest Favor Preliminary Injunctive
     Relief. .................................................................................................... 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ACLU v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) ...................................................................... 19

*Am. Libraries Ass'n v. Pataki*,
   969 F. Supp. 160 (S.D.N.Y. 1997) ................................................................. 19

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ........................................................ 19, 20, 23, 24, 25

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*,
   713 F.3d 1187 (9th Cir. 2013) .......................................................................... 3

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
   729 F.3d 937 (9th Cir. 2013) .................................................................. 6, 12, 17

*Bacchus Imports, Ltd. v. Dias*,
   468 U.S. 263 (1984) ................................................................................. 5, 6, 9

*Baldwin v. G.A.F. Seelig, Inc.*,
   294 U.S. 511 (1935) ................................................................................... 8, 10

*Bioganic Safety Brands, Inc. v. Ament*,
   174 F. Supp. 2d 1168 (D. Colo. 2001) .......................................................... 19

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ....................................................................................... 25

*Bonaparte v. Tax Court*,
   104 U.S. 592 (1882) ....................................................................................... 25

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
   476 U.S. 573 (1986) ....................................................................................... 10

*C&A Carbone, Inc. v. Town of Clarkstown*,
   511 U.S. 383 (1994) ........................................................................... 9, 10, 13, 25

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
   563 F.3d 847 (9th Cir. 2009), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012) ...................................................... 20

ii

*Chinatown Neighborhood Ass'n v. Harris*,
  794 F.3d 1136 (9th Cir. 2015) ............................................................... 12, 18

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*,
  454 U.S. 290 (1981) ....................................................................................... 25

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*,
  298 F.3d 201 (3d Cir. 2002) ........................................................................... 8

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ......................................................................... 2

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ....................................................................................... 13

*Gen. Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) ..................................................................................... 3, 9

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ................................................................................... 11, 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ..................................................................................... 3, 6

*Kassel v. Consol. Freightways Corp. of Del.*,
  450 U.S. 662 (1981) ....................................................................................... 18

*Missouri ex rel. Koster v. Harris*,
  847 F.3d 646 (9th Cir. 2017) ......................................................................... 6

*L.A. Mem'l Coliseum Comm'n v. NFL*,
  634 F.2d 1197 (9th Cir. 1980) ....................................................................... 20

*Legato Vapors, LLC v. Cook*,
  847 F.3d 825 (7th Cir. 2017) ............................................................. 10, 11, 12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................................... 2

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ......................................................................... 25

*Minnesota v. Clover Leaf Creamery Co.*,
  449 U.S. 456 (1981) ....................................................................................... 11

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*Monterey Mech. Co. v. Wilson,*
   125 F.3d 702 (9th Cir. 1997) ....................................................................... 19

*Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown,*
   567 F.3d 521 (9th Cir. 2009) ......................................................................... 9

*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
   682 F.3d 1144 (9th Cir. 2012) ..................................................................... 16

*Nat'l Council of La Raza v. Cegavske,*
   800 F.3d 1032 (9th Cir. 2015) ....................................................................... 3

*Nat'l Foreign Trade Council v. Natsios,*
   181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ....................................................... 14

*New Energy Co. of Ind. v. Limbach,*
   486 U.S. 269 (1988).......................................................................................... 5

*Pac. Nw. Venison Producers v. Smitch,*
   20 F.3d 1008 (9th Cir. 1994) ....................................................................... 15

*Pharm. Research & Mfrs. of Am. v. Walsh,*
   538 U.S. 644 (2003).......................................................................................... 13

*Pike v. Bruce Church, Inc.,*
   397 U.S. 137 (1970)............................................................................. 14, 15, 16

*Raymond Motor Transp., Inc. v. Rice,*
   434 U.S. 429 (1978)................................................................................. 16, 18

*Rocky Mountain Farmers Union v. Corey,*
   730 F.3d 1070 (9th Cir. 2013) ................................................................. 6, 12

*Rocky Mountain Farmers Union v. Corey,*
   913 F.3d 940 (9th Cir. 2019) ....................................................................... 12

*S. Pac. Co. v. Arizona ex rel. Sullivan,*
   325 U.S. 761 (1945).......................................................................................... 15

*Sam Francis Found. v. Christies, Inc.,*
   784 F.3d 1320 (9th Cir. 2015) ..................................................................... 13

iv

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..................................................................................... 3

*Temple Univ. v. White*,
    941 F.2d 201 (3d Cir. 1991) ...................................................................... 20

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    139 S. Ct. 2449 (2019)................................................................................. 4

*UFCW Local 1500 Pension Fund v. Mayer*,
    895 F.3d 695 (9th Cir. 2018) .................................................................... 13

*Union Pac. R.R. v. Cal. Pub. Utils. Comm'n*,
    346 F.3d 851 (9th Cir. 2003) .................................................................... 15

*W. Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994)................................................................................ 4, 5

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................. 20

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) ............................................................ 13, 17

**Other Authorities**

Legislative Analyst's Office, Report on Proposition 12 (Nov. 6, 2018) ............................ 4

Prop. 2, Official Voter's Information Guide........................................................................ 4

Prop. 12 § 2 ...................................................................................................................... 11

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1

## REPLY BRIEF

2    When they enacted Proposition 2 in 2008 and Proposition 12 in 2018, the voters of

3  California required farmers in California to abide by specified confinement requirements

4  for breeding sows and veal calves raised on farms in the State. That was a legitimate exer-

5  cise of California's police power to regulate farming practices within the State. But when

6  the voters decided to adopt a sales ban that extended those confinement requirements to

7  farmers in other States and countries, they violated the limitations the Commerce Clause

8  and the federal structure of the U.S. Constitution place on California's and every other

9  State's ability to discriminate against, regulate, and burden interstate commerce.

10    As explained below, defendants, intervenors, and their *amicus* do not undermine the

11  conclusion that the Meat Institute is likely to prevail on its constitutional challenges because

12  Proposition 12's sales ban impermissibly discriminates against interstate commerce, regu-

13  lates interstate commerce outside California's borders, and imposes burdens on interstate

14  commerce that clearly exceed any legitimate local benefit.

15    Further, unless Proposition 12's sales ban is enjoined, this unconstitutional trade bar-

16  rier will irreparably harm pork and veal farmers throughout the nation—many of whom are

17  family farmers who have labored in these industries for generations—by rendering obsolete

18  the facilities in which they have collectively invested hundreds of millions of dollars and

19  potentially excluding them from the California market. And these harms will reverberate

20  throughout the supply chain, increasing costs and requiring packers, processors, and distrib-

21  utors to overhaul their operations to continue serving the California market. The costs to the

22  out-of-state pork and veal industries will be in the hundreds of millions of dollars.

23    Defendants do not meaningfully dispute these harms, nor could they—the sales ban's

24  entire point is to force out-of-state pork and veal producers to change their facilities to com-

25  ply with California's confinement requirements or be excluded from the California market.

26  The Meat Institute submitted declarations from its members describing the massive costs

27  and disruption that Proposition 12's sales ban will impose on them and the small farmers

28  with whom they contract. Defendants simply ignore those declarations.

1

For the reasons described below, the Meat Institute has shown that it is likely to prevail on its constitutional claims, or, at a minimum, that there are serious questions going to the merits and a balance of hardships that tips sharply in the Meat Institute's favor. Accordingly, the Court should preliminarily enjoin Proposition 12's unconstitutional sales ban as applied to pork and veal produced outside California.

## I. The Meat Institute Is Likely To Prevail On The Merits.

The Meat Institute is likely to prevail on the merits—or at least has raised "serious questions going to the merits," *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018)—because Proposition 12's sales ban violates the Commerce Clause and the federal structure of the Constitution by (i) discriminating against interstate commerce; (ii) regulating extraterritorial commerce; and (iii) excessively burdening interstate commerce.

### A. The Meat Institute Has Standing.

At the outset, the Meat Institute plainly has standing to bring this lawsuit. Defendants contend that the complaint is deficient because it (i) fails adequately to allege the nature of the injuries that Proposition 12's sales ban will cause to the Meat Institute's members and (ii) does not identify by name a specific Meat Institute member who will suffer those injuries. Defs. Br. 5–6. Both arguments are meritless.

First, with regard to the nature of the injury, defendants address only the introductory allegations in ¶¶ 9–11 of the complaint, ignoring entirely the more specific allegations in ¶¶ 80–85. The latter allegations explain in detail how Proposition 12's sales ban will harm the Meat Institute's members and are more than sufficient to state a claim upon which relief can be granted. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (quotation marks and alterations omitted).

Second, there is no requirement that the complaint identify a specific member where, as here, "it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action," and "the defendant need

not know the identity of a particular member to understand and respond to an organization's claim of injury." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *see also* Minutes (in Chambers) at 12, *Torres v. DHS*, No. 5:18-cv-02604-JGB-SHK (C.D. Cal. Oct. 24, 2019), ECF No. 101 ("[I]t is not necessary at this early stage to name specific members impacted by the alleged violations."). To the extent it is necessary to identify specific members to support standing to obtain a preliminary injunction, the Meat Institute has done so by submitting declarations from seven members describing how they are injured by Proposition 12's sales ban. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (affidavits submitted by organization member were "sufficient to establish Article III standing" in support of preliminary injunction); *cf. Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194–95 (9th Cir. 2013) (organization failed to demonstrate standing at summary judgment stage by not submitting member declarations attesting to injury). Nothing more is required.

## B.   Proposition 12's Sales Ban Is A Protectionist Trade Barrier.

Defendants fail to rebut the Meat Institute's showing that Proposition 12's sales ban is a trade barrier that discriminates against out-of-state competitors and cannot survive rigorous scrutiny. NAMI Br. 7–14. Defendants and intervenors do not defend Proposition 12 under heightened scrutiny, Defs. Br. 13, and thus the only issue is whether the Meat Institute has shown a likelihood of success or a serious question as to whether it is discriminatory.

Defendants, intervenors, and their *amicus* ignore the first principles underlying the dormant Commerce Clause's prohibition on discrimination:

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299–300 (1997) (quoting *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949)); *see also Hunt v. Wash. State Apple Advert.*

3

*Comm'n*, 432 U.S. 333, 350 (1977) (referring to "the Commerce Clause's overriding requirement of a national 'common market'"). Or, as the Supreme Court explained earlier this year, "removing state trade barriers was a principal reason for the adoption of the Constitution." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2460 (2019). As a result, the Commerce Clause prevents States from adopting regulations that operate "to neutralize advantages belonging to the place of origin." *W. Lynn Creamery v. Healy*, 512 U.S. 186, 194 (1994). Proposition 12 impermissibly closes the California market to countless farmers from across the country unless they reconstruct their barns and facilities to meet an unprecedented mandate imposed from afar by California voters.

1.    Proposition 12 plainly results in "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Defs. Br. 8. Defendants acknowledge that Proposition 12, which was adopted in November 2018, prohibits the sale of animals that were confined "in a manner that prevents the animal from … turning around freely," and that "in-state producers were given six years to come into compliance with this standard when it was first introduced in Proposition 2." Defs. Br. 12. Specifically, in 2008, advocates for Proposition 2 highlighted that it "provides ample time—until 2015" for in-state farmers to meet the new "turnaround" confinement standard. Prop. 2, Official Voter's Information Guide. In contrast, Proposition 12 does not give out-of-state producers "ample time" to come into compliance with the "turnaround" standard. That differential treatment of in-state and out-of-state producers is significant because, as California's Legislative Analyst's Office has reported, it "could take several years for enough farmers" "to meet [Proposition 12's] requirements." Legislative Analyst's Office, Report on Proposition 12, at 4 (Nov. 6, 2018). This patent discrimination creates a trade barrier to the California market that impermissibly disfavors out-of-state farmers and benefits in-state competitors.

Intervenors acknowledge the discriminatory treatment, but argue that there is no Commerce Clause violation because California "accounts for only a small percentage of U.S. hog production." Invrs. Br. 12. That is wrong. Where, as here, the discrimination is patent, "neither a widespread advantage to in-state interests nor a widespread disadvantage

to out-of-state competitors need be shown." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 276 (1988); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 268 (1984) (rejecting argument that discrimination did not violate Commerce Clause because it involved "well under one percent of the total liquor sales in Hawaii"). Indeed, whether discrimination bolsters a thriving industry or subsidizes new or struggling industries makes no difference under the Commerce Clause. *W. Lynn Creamery*, 512 U.S. at 201. Finally, intervenors' position that there is no competition with in-state interests is belied by Proposition 2, which applied *only* to California farmers and imposed confinement standards for pork and veal.

Defendants argue that the Meat Institute fails to "cite any authority to support the position that a law is discriminatory if it does not provide out-of-state entities 'lead time' to come into compliance with requirements that apply equally to in-state entities." Defs. Br. 12.[1] But the law is settled that the "commerce clause forbids discrimination, whether forthright or ingenious. In each case it is [the court's] duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *W. Lynn Creamery*, 512 U.S. at 201. Here, the discrimination is forthright: In 2008, in-state producers were granted six years to build new barns and animal housing facilities to meet California's "turnaround" standard. In contrast, Proposition 12 mandates that out-of-state producers meet the "turnaround" standard without providing them with the same timetable to meet this requirement—a requirement that many pork producers and the independent farmers with whom they contract could not meet without making significant changes to their facilities. *See* NAMI Br. 24; Bollum Decl. ¶¶ 4–5; Darrell Decl. ¶¶ 9–10, 12–13; Neff Decl. ¶¶ 5–6; Rennells Decl. ¶¶ 9, 11; Turner Decl. ¶¶ 7, 10.

---

[1] Intervenors argue that the "lead time" given to in-state producers "could actually be an economic advantage … to out-of-state producers" because the costs of transitioning the production facilities have decreased. Invrs. Br. 13. This ignores that California's LAO explained that it would take out-of-state producers "years" to come into compliance with Proposition 12's requirements, and thus granting in-state producers six years of lead time to come into compliance (while out-of-state producers are granted none) plainly discriminates in favor of in-state producers by giving them ample time to restructure their facilities.

2.     Proposition 12 also is discriminatory because it imposes "a leveling effect which insidiously operates to the advantage of local … producers." *Hunt*, 432 U.S. at 351; *see* NAMI Br. 7–10. Defendants contend that this issue has been resolved by *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013) ("*Ass'n des Eleveurs*"), which they argue stands for the proposition that "treating out-of-state producers the same as in-state producers—as Proposition 12 does—is not discriminatory." Defs. Br. 10. Contrary to defendants' argument, *Ass'n des Eleveurs* does not hold that a state regulation satisfies Commerce Clause scrutiny whenever it applies "to both intrastate and interstate products." 729 F.3d at 948; *see also Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 655 (9th Cir. 2017) (following *Ass'n des Eleveurs*). Indeed, as *amicus* California Egg Farmers admits, Cal. Egg Farmers Br. 10 n.9, *Ass'n des Eleveurs* does not address whether a "facially neutral" statute satisfies the Commerce Clause even if its practical effect or purpose is to burden and discriminate against out-of-state competitors, *see Bacchus*, 468 U.S. 263 (striking down facially neutral statute designed to benefit in-state interests); *cf. Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1092 (9th Cir. 2013) (analyzing whether, under *Hunt*, state regulation that applied to both in-state and out-of-state interests impermissibly stripped away competitive advantage from out-of-state competitors).

The Supreme Court's decision in *Hunt* is directly on point. There, the Supreme Court struck down a North Carolina statute that required uniform labeling on all apples sold in North Carolina because it (i) "rais[ed] the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected," (ii) "ha[d] the effect of stripping away from the Washington apple industry the competitive and economic advantages it ha[d] earned for itself," and (iii) "ha[d] a leveling effect which insidiously operate[d] to the advantage of local apple producers." 432 U.S. at 351. Here, too, Proposition 12 has an impermissible "leveling effect" by imposing on out-of-state competitors the same animal confinement standards that California imposes on in-state producers. NAMI Br. 8 (explaining that Proposition 12's sales ban is the direct "lineal descendent of AB 1437," which added a parallel sales ban "to

level the playing field so that in-state producers [we]re not disadvantaged"). By imposing these costs on out-of-state entities, Proposition 12's sales ban has an insidious "leveling effect" that strips away from out-of-state competitors the competitive and economic advantages they have earned for themselves and which the Commerce Clause protects.

Defendants argue that *Hunt* is distinguishable because Proposition 12 "does not strip away any advantages that Plaintiff has earned." Defs. Br. 11; *see* Cal. Egg Farmers Br. 11–12. That is wrong. The Meat Institute's declarations, which defendants ignore, highlight the hundreds of millions of dollars that its members have invested to build state-of-the-art facilities for veal and pork production that have been rendered obsolete by Proposition 12's mandated approach to animal confinement. The veal industry has invested more than $150 million as part of a 10-year initiative to adopt "tether-free group housing," but "Proposition 12 now threatens to upset these investment-backed expectations" by imposing space requirements "more than twice what the [European Union] requires for even the largest calves." Bakke Decl. ¶¶ 7–8. As explained by Dale Bakke, President of the American Veal Association, these massive industry-wide investments consist of "typical expenditures around $225,000 per farm," with many farmers "financ[ing] that transition by taking on long-term debt," and "enter[ing] into long-term production contracts with processors to cover these costs." *Id.* ¶ 7.[2] Likewise, pork producers and farmers have spent hundreds of millions of dollars to convert their sow farms to "group housing," which has been praised

---

[2] *See also* Bollum Decl. ¶¶ 4–5 (describing impact of Proposition 12 on the "more than 500 independent family farmers across the Midwest, many of which have been Hormel suppliers for generations"); Darrell Decl. ¶¶ 4, 11, 13 (describing impact on more than 3,000 independent farmers who would "be required to restructure their farms"); Turner Decl. ¶¶ 10–12 ("[F]armers would be required to make substantial capital investments to eliminate gestation crates, restructure their farms to adopt group housing of breeding sows, adopt new procedures to care for breeding sows, and train their employees with respect to these new procedures."); Rennells Decl. ¶¶ 4, 11 (describing impact on "250 company-owned and independent family farms in Indiana, Michigan, Ohio and Pennsylvania"); Neff Decl. ¶ 6 ("Compliance with Proposition 12 will be extremely burdensome for the independent farmers who sell their hogs to Tyson.").

by animal rights groups, but "would not comply with Proposition 12." Darrell Decl. ¶¶ 9–10 (describing Smithfield's $360 million investment).[3] These advantages were "earned."

The Supreme Court's decision in *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), confirms that a law can have a forbidden protectionist effect by stripping away competitive advantages that out-of-state competitors enjoy due to less onerous regulations in their home States. *See id.* at 527 (New York's sales ban impermissibly "neutralize[d] advantages" Vermont milk dealers had because Vermont, unlike New York, did not dictate a minimum price to be paid to producers); *see also Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 213 (3d Cir. 2002) (holding that, under *Baldwin* and *Hunt*, heightened scrutiny would apply to a minimum-price law if it eliminated a competitive advantage enjoyed by out-of-state dealers "whose home states do not prop up milk producers' prices"). Defendants ignore the Third Circuit's decision in *Cloverland*, which relied upon *Baldwin*, and dismiss *Baldwin* as a "Depression-era case." Defs. Br. 10. But as *Cloverland* and other cases show, Justice Cardozo's seminal decision retains its vitality. *See* NAMI Br. 9 n.4.

3. Finally, with regard to potential discrimination between milk-fed veal and "bob" veal culled from California dairy farms, NAMI Br. 11, defendants do not deny that Proposition 12 does not apply to bob veal produced in California from calves in facilities that do not satisfy the space requirements of Proposition 12. Nor do defendants dispute that (i) milk-fed veal and bob veal compete against one another in the same market, and (ii) milk-fed veal is produced only outside California, whereas California is a significant producer of bob veal. Bakke Decl. ¶ 17 (California has "the fourth highest number of commercially slaughtered calves in the nation"). Instead, defendants argue that "Plaintiff has not established that bob veal producers and milk-fed veal producers are similarly situated groups." Defs. Br. 12 (citing *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*,

---

[3] *See also* Rennells Decl. ¶ 12 ("Farmers who have been expending significant time and resources to satisfy the group housing goals announced by Clemens would need to alter those plans to satisfy the requirements of Proposition 12."); Bollum Decl. ¶ 5 ("The costs associated with these efforts [to comply with Proposition 12] would be tens of millions of dollars, on top of the expenses independent farmers have incurred for recent renovations that may now not meet Proposition 12's specific requirements.").

567 F.3d 521, 527 (9th Cir. 2009)). But the Supreme Court has held that the Commerce Clause "protects markets and participants in markets," *Gen. Motors*, 519 U.S. at 300, and here the discrimination is directed at products (milk-fed veal and bob veal) that compete in the same market, *see Bacchus*, 468 U.S at 269 (holding Commerce Clause applied because there was evidence that exempted products competed with non-exempted products).[4]

In sum, Proposition 12 violates the Commerce Clause by conferring direct competitive advantages on California pork and veal producers and closing off access to the California market for farmers from outside of California unless they spend millions of dollars to restructure their operations to provide a "level playing field" for California competitors.

### C.    Proposition 12's Sales Ban Regulates Extraterritorial Commerce.

Defendants also fail to rebut the Meat Institute's showing that Proposition 12's sales ban violates the Commerce Clause and structural federalism because it impermissibly "attach[es] restrictions to … imports in order to control commerce in other States." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393 (1994); *see* NAMI Br. 15–19.

1.    Defendants contend that Proposition 12's sales ban "regulates only in-state commerce" because it applies only to sales that occur in California and is "indifferent to the sales of veal and pork outside of California." Defs. Br. 13–14; *see also* Invrs. Br. 6. That is, defendants argue that if a product is sold in California, then California is free to dictate the conditions under which the product is produced in other States and countries, even if those conditions have no effect on the product's properties when used in California and cause no in-state harms. That sweeping proposition, which would allow large States like California to use their economic leverage to mandate manufacturing and employment standards nationwide (indeed, worldwide), is incorrect.

---

[4] Defendants rely upon the statement from *Brown* that "competing in the same market is not sufficient to conclude that entities are similarly situated." Defs. Br. 12. But *Brown* addressed whether opticians were similarly situated to optometrists and ophthalmologists. 567 F.3d at 525. *Brown* explained that California regulated optometrists and ophthalmologists as health care professionals, whereas opticians were regulated as "commercial interests." Here, there is no similar basis for suggesting that farmers in California who sell bob veal are not similarly situated to out-of-state farmers who sell milk-fed veal in the same market.

Here again, defendants' argument is irreconcilable with the Supreme Court's seminal decision in *Baldwin*. The New York law struck down in *Baldwin* applied only to sales of milk in New York and was "indifferent" to sales in other States. 294 U.S. at 519 & n.1. Likewise, the Indiana law struck down in *Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017), applied only to sales of vaping products in Indiana and was "indifferent" to sales in other States. *Id.* at 828. Both laws nonetheless were invalid because they conditioned in-state sales on compliance with the State's demands regarding the conduct of out-of-state commerce. *See also Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986) (the "mere fact that the effects" of a state law "are triggered only by sales of [products] within the State … does not validate the law if it regulates the out-of-state transactions of [producers] who sell in-state"). Defendants do not claim these cases were wrongly decided. But under defendants' proposed rule, the laws struck down in *Baldwin* and *Legato Vapors* should have been upheld because they prohibited only in-state sales.

Defendants likewise have no persuasive answer to the Supreme Court's decision in *Carbone*, which relied upon *Baldwin* for the proposition that "States and localities may not attach restrictions to exports or imports in order to control commerce in other States," 511 U.S. at 393—which describes Proposition 12's sales ban to a tee. Defendants contend that *Carbone* "addresse[d] economic protectionism, not extraterritoriality." Defs. Br. 13 n.5. But *Carbone* addressed both—after holding that the law was discriminatory, the Court rejected Clarkstown's effort to justify its flow-control ordinance "as a way to steer solid waste away from out-of-town disposal sites that it might deem harmful to the environment," because that justification conflicted with *Baldwin*'s extraterritoriality holding and would impermissibly "extend the town's police power beyond its jurisdictional bounds." 511 U.S. at 393. Just as Clarkstown could not restrict the export of locally produced waste because of concerns about out-of-town environmental contamination, California cannot restrict the import of wholesome pork and veal products in an effort to control out-of-state farming practices.[5]

---

[5] *Carbone* also cannot be distinguished on the ground that "California clearly has jurisdictional control over the products sold within the State." Cal. Egg Farmers Br. 17 n.13; *see* Defs. Br. 13 n.5. Clarkstown similarly had "jurisdictional control" over waste produced

Nor is Proposition 12's sales ban a legitimate exercise of California's police power that has only "incidental effects" on out-of-state farming conditions. Invrs. Br. 6. California's interest in regulating animal confinement conditions within the State is fully met by the California-specific confinement prohibition set forth in § 25990(a), which is not challenged here. By contrast, the sales ban's *entire point* is to compel *out-of-state* farmers to change the way they confine their animals so they can retain access to the California market. There is nothing "incidental" about this extraterritorial effect. Changing farming practices "wholly outside [California's] borders" is both the "practical effect" of the sales ban, *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989), and its intended design. Otherwise the sales ban would not advance Proposition 12's stated purpose of "phasing out" the confinement conditions to which California objects. Prop. 12 § 2.

Similarly, California is not here regulating the properties of a good in ways that may incidentally require out-of-state producers to alter their production methods. *See* Defs. Br. 14; Invrs. Br. 8; *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) (upholding ban on plastic milk containers). Absent conflict with federal law, States unquestionably have authority to regulate the properties of imported goods (including packaging and labeling) to ensure they do not cause harm when consumed in the State. But that is not what Proposition 12 does. *See Legato Vapors*, 847 F.3d at 832 (distinguishing such laws' "indirect effects on out-of-state manufacturers" from laws that directly dictate out-of-state production methods). Proposition 12 regulates the production *process*, not the product—California has no objection to pork and veal cuts with indistinguishable properties that come from animals housed in the way California approves. And the prohibited sales pose no risk of consumer harm compared to the sales California permits. Defendants make no attempt to rebut the Meat Institute's showing that Proposition 12's food-safety justification is illusory, *compare* NAMI Br. 12–14, *with* Defs. Br. 18 n.6, and they do not identify any other in-state harms purportedly traceable to farm animal confinement conditions in other States

within the town. *Carbone*, *Baldwin*, and the Supreme Court's other extraterritoriality cases hold that States may not leverage their "jurisdictional control" over products or transactions within the State to control commerce outside the State.

and countries, *cf. Rocky Mountain*, 730 F.3d at 1104 (holding that a State "may regulate with reference to *local harms*, structuring its internal markets to set incentives for firms to produce *less harmful products* for sale in California") (emphases added); *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 952 (9th Cir. 2019) ("states may regulate to mini- mize the *in-state harm* caused by products sold in-state") (emphasis added).

This case is thus on all fours with *Legato Vapors*. Indeed, the constitutional infirmity is even clearer here than in *Legato Vapors*. There, the State argued that its manufacturing specifications were "vital to protect vaping products from contamination." 847 F.3d at 833. Even so, it could "not try to achieve that goal by direct extraterritorial regulation of the manufacturing processes and facilities of out-of-state manufacturers." *Id.* at 834. Defend- ants try to distinguish *Legato Vapors* on the ground that Proposition 12 is less "detailed" than the law struck down in *Legato Vapors*. Defs. Br. 14; *see also* Invrs. Br. 8. But even if that were a valid distinction in principle (it is not), that distinction does not apply here be- cause Proposition 12 imposes highly detailed and specific requirements—down to the pre- cise number of square feet that must be afforded to each sow and calf.

2.      Unable to offer a principled distinction of *Baldwin*, *Carbone*, or *Legato Va- pors*, defendants instead contend that "[t]he Ninth Circuit has consistently rejected chal- lenge[s] like this one." Defs. Br. 14. Not so. The Meat Institute already explained why the Ninth Circuit's fuel-regulation cases are inapposite, NAMI Br. 17–18, and defendants have no response. Similarly inapposite is *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136 (9th Cir. 2015). The law upheld there was a flat ban on a product (detached shark fins), *id.* at 1140, and did not impose "California standards" on other States or "attempt to regu- late" out-of-state commerce by conditioning access to California's market on compliance with California's dictates as to how that commerce must be conducted, *id.* at 1146.

As for *Ass'n des Eleveurs*, neither defendants nor intervenors contend that the Meat Institute's extraterritoriality challenge should be rejected on the ground that Proposition 12 is not a price control—which was the *only* reason *Ass'n des Eleveurs* gave for rejecting the similar challenge to California's *foie gras* sales ban. 729 F.3d at 951. For good reason—the

en banc Ninth Circuit has since held that the extraterritoriality doctrine is not limited to price controls, *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324–25 (9th Cir. 2015) (en banc), and a contrary conclusion would conflict with numerous decisions of the Supreme Court, the Ninth Circuit, and other circuits applying the extraterritoriality doctrine outside the context of price controls, NAMI Br. 16–18 & nn.9–11. An ad hoc "price control" limitation would also be arbitrary and unprincipled—States have no more authority to control other forms of out-of-state commerce than they do to control out-of-state prices. And although *Christies* did not expressly overrule *Ass'n des Eleveurs*, that case does not control a separate challenge brought to a different statute. *See UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 700 n.3 (9th Cir. 2018).

Unlike defendants and intervenors, *amicus* California Egg Farmers does contend that this Court is bound by *Ass'n des Eleveurs*' price-control rationale. Cal. Egg Farmers Br. 15–17. An *amicus* cannot raise a new argument not made by the parties, *see Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009), but even so, it is wrong. The Ninth Circuit would not need to overrule *Ass'n des Eleveurs* to rule for the Meat Institute, and nothing requires this Court to apply the since-superseded price-control rationale in adjudicating a separate challenge to a different statute. *See Mayer*, 895 F.3d at 700 n.3. Nor has the Supreme Court "strongly implied that *Baldwin* and *Healy* are indeed limited to the price-fixing context." Cal. Egg Farmers Br. 15 (citing *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)). *Walsh* addressed alleged extraterritorial effects on pharmaceutical *prices* and held only that the plaintiff had not established the requisite degree of extraterritorial control. 538 U.S. at 669. The Court had no occasion to address whether the doctrine applies outside of the price-control context, and certainly did not overrule earlier cases like *Carbone* applying the doctrine to non-price controls. *See Carbone*, 511 U.S. at 393; *Healy*, 491 U.S. at 333 n.9 (observing that the plurality's extraterritoriality holding in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)—a non-price-control case—"significantly illuminates the contours of the constitutional prohibition on extraterritorial legislation").

3.     Finally, defendants ask this Court to ignore the radical implications of a ruling upholding Proposition 12's sales ban. *See* NAMI Br. 19. Defendants do not explain why, if Proposition 12's sales ban is valid, California or any other State could not likewise condition access to its market on compliance with the State's requirements for how meat products or any other products must be made—requirements based not on any in-state harms caused by the products, but solely on the State's objection to production conditions in other States and countries. *See* Defs. Br. 16 (dismissing without explanation "hypotheticals of state over-reach"); Cal. Egg Farmers Br. 18 (dismissing "parade of horribles" without providing any basis to distinguish them); *cf. Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 69–70 (1st Cir. 1999) (striking down Massachusetts law that "condition[ed] state procurement decisions on conduct that occurs in Burma" because "[i]f Massachusetts can enact a Burma law, so too can California or Texas"), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). If California's interest in *animal* welfare is sufficient to sustain a ban on imported meats produced under farm conditions California deems objectionable, California's interest in *human* welfare surely would likewise be sufficient to sustain a ban on imported goods produced under employment conditions California deems objectionable. Such laws, no less than Proposition 12's sales ban, would be "geographically neutral sales ban[s] on products made via a particular production method." Cal. Egg Farmers Br. 18. And every argument defendants have made here as to why Proposition 12 does not violate the extraterritoriality doctrine would apply equally to such laws. Proposition 12's sales ban is no less an example of "state overreach" than the hypothetical sales bans defendants dismiss.

**D.     Proposition 12's Sales Ban Excessively Burdens Interstate Commerce.**

Defendants likewise fail to undermine the Meat Institute's showing that Proposition 12's sales ban violates the Commerce Clause under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), because it imposes substantial burdens on interstate commerce that are clearly excessive in relation to any legitimate local benefits. *See* NAMI Br. 19–22.

1.     The Meat Institute has shown that Proposition 12's sales ban substantially burdens interstate commerce. As the Meat Institute explained, Proposition 12's sales ban will

14

require veal and pork producers to either abandon the California market or spend hundreds of millions of dollars reconstructing their existing barns and constructing new ones to comply with California's confinement requirements, and will require processors, packers, and distributors to bear increased costs for Proposition-12 compliant animals and to reorganize their operations to serve the California market. *See id.* at 20–21.

Defendants argue that these burdens are not substantial because, in their view, the only cognizable burdens are those resulting from laws that either discriminate or create inconsistent regulation of activities that are inherently national or require a uniform system of regulation. Defs. Br. 17. As an initial matter, Proposition 12's sales ban is discriminatory. *See* NAMI Br. Part I.A; *supra* Part I.B. But even if it were not, defendants' premise is incorrect—while discrimination and interference with uniform operations are "two ways of demonstrating that a law imposes a substantial burden," Defs. Br. 17, they are not the *only* ways. In assessing the "nature of th[e] burden," *Pike*, 397 U.S. at 145, courts have also considered, for example, whether the law has significant extraterritorial effects or imposes burdens that fall primarily on out-of-state interests, *see* NAMI Br. 22; *Union Pac. R.R. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 871–72 (9th Cir. 2003); *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994). These "types of impacts on interstate commerce are of special importance in the balance with the state's putative interest," *Pac. Nw. Venison*, 20 F.3d at 1015, because, among other reasons, "to the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected," *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767 n.2 (1945).

That is the case here. Defendants do not dispute that California produces no milk-fed veal and accounts for a small percentage of U.S. hog production. NAMI Br. 22. Proposition 12's burdens thus fall primarily on out-of-state interests who have no representation in California's political process. Moreover, with regard to the sales ban in particular, the interests of the in-state California producers who are affected by Proposition 12 are directly opposed

to the interests of out-of-state veal and pork producers. The sales ban imposes no incremental burden on in-state California producers because they are already directly subject to Proposition 12's California-specific confinement prohibition in § 25990(a). And, without the sales ban, the in-state producers would be at a competitive disadvantage vis-à-vis out-of-state producers who could sell their products in California without complying with California's costly confinement requirements. The affected in-state interests thus have every incentive to advocate for a sales ban that mandates a "level" playing field—so long as it is California's playing field—as they did when they lobbied for AB 1437, and as *amicus* California Egg Farmers is doing in this very case.

Defendants further err in contending that the sales ban merely "precludes a preferred, more profitable method of doing business." Defs. Br. 17 (quotation marks omitted). The ban will render obsolete facilities in which thousands of independent farmers in the pork and veal industries have invested hundreds of millions of dollars, and require them to invest hundreds of millions more in reconstructing existing facilities and constructing new ones; it will likely drive many farmers, packers, and processors from the California market; and it will force those who remain to bear increased costs and "to reorganize slaughter, packing, and distribution operations to segregate animals and products that comply with the law from those that do not." NAMI Br. 21. The sales ban thus substantially burdens out-of-state interests and significantly "impair[s] the free flow of materials and products across state borders." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1154–55 (9th Cir. 2012); *see Pike*, 397 U.S. at 140, 144–45 (finding Commerce Clause violation based on regulation's "practical effect" of requiring plaintiff to build packing facilities "that would take many months to construct and would cost approximately $200,000"); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 445 & n.21 (1978) (holding that lower court erred in deeming increased costs irrelevant to substantial-burden analysis). These effects are not remotely "speculative." Invrs. Br. 16. They are certain to occur if the law is not enjoined, as shown not only by common sense (the sales ban's entire point is to force changes to existing

housing arrangements for veal calves and breeding sows), but also by multiple unrebutted declarations from entities directly affected by the sales ban.

Nor does *Ass'n des Eleveurs* preclude a finding that Proposition 12's sales ban substantially burdens interstate commerce. The economic impact of Proposition 12's sales ban is orders of magnitude greater than the impact of the *foie gras* sales ban. *See Ass'n des Eleveurs*, 729 F.3d at 952 (plaintiffs alleged only a $5 million loss). Moreover, the *Ass'n des Eleveurs* court concluded that the plaintiffs there failed to carry their burden in part because they had improperly included products not affected by the ban in their estimation of the economic impact, *id.*, an issue not presented here. The *Pike* question must be decided based upon the particular record presented here, and that record leaves no doubt that Proposition 12's sales ban substantially burdens interstate commerce.

2.   These substantial burdens clearly outweigh any legitimate local interests served by the sales ban. Neither defendants nor intervenors try to justify the ban as a food-safety measure or to rebut the Meat Institute's showing that any food-safety justification is illusory. *Compare* NAMI Br. 12–13, 22, *with* Defs. Br. 18 n.6.[6] Thus, for purposes of the Meat Institute's preliminary injunction motion, the only question is whether California's asserted interest in "preventing animal cruelty," Defs. Br. 18, is sufficient to sustain the ban.

It is not. While California has a legitimate interest in the welfare of animals *in California*, no authority supports defendants' contention that California has a legitimate *local* interest in dictating the housing conditions for farm animals *in other States and countries*. Defendants cite *Ass'n des Eleveurs*, but they misconstrue the decision. The court there deferred to *the legislature's* judgment that the *foie gras* sales ban would contribute to "preventing animal cruelty *in California*." 729 F.3d at 952–53 (emphasis added). Here, defendants do not contend that the challenged applications of Proposition 12's sales ban (namely, applications to veal and pork from *outside* California, *see* Compl. Relief Requested) contribute to preventing animal cruelty *in California*. And, as the Meat Institute explained and

---

[6] Defendants' *amicus* tries to assert a food-safety interest, Cal. Egg Farmers Br. 23–24, but it cannot carry the State's burden for it, *see Zango*, 568 F.3d at 1177 n.8. In any event, it offers no evidence that Proposition 12 provides safety benefits for pork or veal.

defendants do not dispute, here there is no legislative judgment to defer to because Proposition 12 was a ballot proposition with no legislative fact-finding. NAMI Br. 22.[7]

In any event, even if California had a legitimate local interest in the conditions under which breeding sows and veal calves are housed on farms in other States and countries, any such interest is clearly outweighed by the burdens the sales ban imposes on interstate commerce. That is particularly so given (i) the sales ban's under-inclusiveness and (ii) its disproportionate impact on out-of-state interests. As to the first, defendants have no response to the Meat Institute's showing that the sales ban is riddled with exceptions that permit sales of pork and veal products even when the sows and calves were not housed in compliance with Proposition 12. *See* NAMI Br. 13–14; *Raymond Motor Transp., Inc.*, 434 U.S. at 444–45 ("maze of exemptions" undermined State's asserted interest); *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 671 n.12, 675–78 (1981) (plurality) (similar).

As to the second, California has targeted out-of-state producers for burdens it is apparently unwilling to impose on its own farmers when doing so would harm a major California industry. Bakke Decl. ¶ 16. California is the nation's leading producer of dairy milk; its dairy farmers raise thousands of calves in production systems similar to out-of-state milk-fed veal facilities, with far less than 43 square feet per calf. *Id.* Yet, because these calves are not "raised for veal," they are not subject to Proposition 12—not even, apparently, when they are "culled" for production of "bob" veal, of which California is, again, a leading producer. *Id.* ¶¶ 16–17.[8] California's asserted interest in animal welfare should thus be disregarded entirely, or at least heavily discounted, in the *Pike* balance because that interest, it seems, is important only when out-of-state interests bear the economic brunt of the regulation. *See Kassel*, 450 U.S. at 675–76 (plurality) ("Less deference to the legislative

---

[7] Defendants also cite *Chinatown Neighborhood Ass'n*, 794 F.3d at 1147, but that case did not decide whether an asserted interest in the welfare of animals outside California is a proper interest to be weighed in the *Pike* balance. Rather, the court declined to weigh the State's interests because it held that the plaintiff had failed to carry its threshold burden of showing a substantial burden on interstate commerce. *See id.*

[8] Defendants do not deny that such calves are exempt from Proposition 12.

judgment is due … where the local regulation bears disproportionately on out-of-state resi-

dents and businesses."). California should not be permitted to devastate the out-of-state

milk-fed veal and pork industries, and the independent farmers who for generations have

labored in these industries, based on its asserted interest in animal welfare when it has ex-

empted major California industries that raise similarly situated animals from regulation.

## II.   Proposition 12 Will Irreparably Harm The Meat Institute's Members.

The Meat Institute previously showed that, absent a preliminary injunction, its mem-

bers would suffer irreparable harm because Proposition 12 violates their constitutional

rights, and imposes on members the Hobson's choice of either (i) complying with costly

requirements that cannot be remedied through money damages, or (ii) exiting the California

market and thereby losing both millions in revenue from an important market and the good-

will they have earned in the marketplace from both customers and suppliers. NAMI Br. 23–

25. Defendants and intervenors do not undercut any of these conclusions.

1.     The law is settled that constitutional violations cannot be adequately remedied

through damages and therefore generally constitute irreparable harm. *Monterey Mech. Co.*

*v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("We have stated that an alleged constitutional

infringement will often alone constitute irreparable harm."). Defendants argue that a First

Amendment violation qualifies as irreparable harm, Defs. Br. 19, but offer no support for

their view that the same principle does not apply to other violations of the Constitution,

including the Commerce Clause, *see Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559

F.3d 1046, 1058 (9th Cir. 2009) (Supremacy Clause: "[T]he constitutional violation alone,

coupled with the damages incurred, can suffice to show irreparable harm."); *ACLU v. John-*

*son*, 194 F.3d 1149, 1163 (10th Cir. 1999) ("[D]eprivation of the rights guaranteed under

the Commerce Clause constitutes irreparable injury."); *Bioganic Safety Brands, Inc. v. Am-*

*ent*, 174 F. Supp. 2d 1168, 1185 (D. Colo. 2001) (same); *Am. Libraries Ass'n v. Pataki*, 969

F. Supp. 160, 168 (S.D.N.Y. 1997) (same).

2.     As the Meat Institute showed previously, Proposition 12 puts regulated parties

to a Hobson's choice: (i) expend massive resources that cannot be recovered in this litigation

1  in an effort to comply with an unconstitutional requirement, or (ii) exit the California mar-

2  ket, in whole or in part, and suffer the harm from the loss of existing customers and customer

3  goodwill. *See Am. Trucking Ass'ns*, 559 F.3d at 1058–59 (holding that plaintiff demon-

4  strated irreparable harm). Defendants make no response to the showing that Proposition 12

5  puts the Meat Institute's members to an impermissible Hobson's choice.[9]

6  　　At the outset, defendants and intervenors do not dispute that Proposition 12 will im-

7  pose hundreds of millions of dollars in compliance costs or lost revenues, and that these

8  harms are not recoverable in this lawsuit. They argue, however, that "[i]t is well established

9  … that … monetary injury is not normally considered irreparable." Invrs. Br. 20 (quoting

10  *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980)); Defs. Br. 19.

11  But that principle applies only where "[plaintiff's] lost revenues would be compensable by

12  a damage award should the [plaintiff] ultimately prevail on the merits." *L.A. Mem'l Coli-*

13  *seum*, 634 F.2d at 1202. Indeed, as the Ninth Circuit has held: "Because the economic injury

14  doctrine rests only on ordinary equity principles precluding injunctive relief where a remedy

15  at law is adequate, it does not apply where, as here, the [plaintiffs] can obtain no remedy in

16  damages against the state because of the Eleventh Amendment." *See Cal. Pharmacists*

17  *Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 & n.2 (9th Cir. 2009) (citing *Kan. Health Care*

18  *Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994))

19  (agreeing that economic injury is irreparable where "the Eleventh Amendment bars a legal

20  remedy in damages"), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal.,*

21  *Inc.*, 565 U.S. 606 (2012); *cf. Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991)

22

23  ───────────────

24  [9] For their part, intervenors argue that this "theory" of irreparable harm "is flawed" because
25  even if the Meat Institute's members "will have to spend millions of dollars on altering
animal housing to comply with Prop 12," that is not "irreparable harm" because "[b]usiness
harms typically rise to the level of 'irreparable harm only where the loss threatens the very
existence of the movant's business.'" Invrs. Br. 19–21 (emphasis omitted) (quoting *Wis.*
26  *Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). But intervenors omit the first part
of the quotation, which states: "*Recoverable monetary loss* may constitute irreparable harm
27  only where the loss threatens the very existence of the movant's business." *Wis. Gas*, 758
F.2d at 674 (emphasis added). The harms imposed by Proposition 12 are not recoverable at
28  the end of the litigation because the State enjoys Eleventh Amendment immunity.

("[T]he Eleventh Amendment bar to an award of retroactive damages against the Common-wealth clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature.") (citation omitted). Here, absent injunctive relief, the Meat Institute's members will suffer substantial economic harm that is irreparable because the Eleventh Amendment would bar any claim of damages against California.

Further, defendants argue that "Plaintiff intimates that some of its members may need to upgrade their facilities and that others may have to leave the California market, but offers few specifics to support anything more than the mere 'possibility' of harm." Defs. Br. 19; *see* Invrs. Br. 20 (dismissing evidence of harm as "routine compliance expenses"). That argument simply ignores the evidence submitted. For example, the Meat Institute showed that Proposition 12 would render obsolete the veal industry's decade-long, $150 million effort to rebuild and remodel existing facilities. *See* Bakke Decl. ¶¶ 7–10. Further, Proposition 12 will require either a reduction in inventory of 50% to 66% and/or the expenditure of tens of millions of dollars in additional renovation and construction costs, all by January 1, 2020. *See id.* ¶¶ 11–12; Catelli Decl. ¶¶ 8–10; Friesen Decl. ¶¶ 8–14 (estimated cost of compliance $28 million for Marcho Farms). Indeed, as explained by Anthony Catelli, Jr., if Proposition 12 is not enjoined by January 1, 2020, Catelli Brothers will be forced from the California market for milk-fed and grain-fed whole veal meat, losing more than $3.5 million in annual sales in California. Catelli Decl. ¶ 10.

Similarly, the record evidence shows that pork producers have spent hundreds of millions to upgrade their facilities over the past 10 years—including renovations to move from traditional housing to "a group housing environment"—but those efforts are for naught because they would not satisfy the requirements of Proposition 12.[10] The massive costs imposed by Proposition 12 likewise would harm "small family farmers," who already have

---

[10] Darrell Decl. ¶¶ 9–10 (Smithfield's 10-year, $360 million investment to convert to group housing "would not comply with Proposition 12" and thus would require an additional "$100 million in capital investments and increased operating costs"); Bollum Decl. ¶¶ 4–5 (Hormel's cost of reconfiguring and constructing barns would be "tens of millions of dollars, on top of the expenses independent farmers have incurred for recent renovations that

21

"spent significant time and resources complying with the housing arrangements encour-

aged" by their contract partners only to be required to repeat the same process "to comply

with Proposition 12." Darrell Decl. ¶¶ 4, 11–12.[11] Intervenors do not dispute the magnitude

or the necessity of these costs, which cannot be recovered in this case. Invrs. Br. 20.[12]

Defendants also suggest these harms are not "truly imminent" because the "floor-

space requirements for breeding pigs … do not take effect until 2022." Defs. Br. 20; Invrs.

Br. 19. That argument fails on multiple grounds. First, as defendants acknowledge, the

floorspace requirements applicable to the veal industry go into effect in less than two

months, after December 31, 2019. *See* Defs. Br. 3; *cf.* Invrs. Br. 19 n.4 (suggesting that

"consideration of a preliminary injunction should be limited to the veal sales ban"). Second,

the declarations reflect that regulated parties must act immediately to have any hope of

coming into compliance with the floorspace requirement applicable to breeding sows by

December 31, 2021. Although intervenors assert that "[t]he generous phase-in dates of Prop

---

may now not meet Proposition 12's specific requirements"); Rennells Decl. ¶¶ 9–10 (Clemens' cost of compliance "would take several years, and would cost Clemens at least $75 million," including "approximately $15 million" for barn "[r]estructuring").

[11] *See also* Rennells Decl. ¶¶ 11–12 ("independent farmers raising hogs for sale to Clemens" would "be required to make capital investments to restructure their farms"); Turner Decl. ¶ 10 (farmers who contract with JBS "would be required to make substantial capital investments" to "reconstruct their farms to comply with Proposition 12"); Bollum Decl. ¶ 5 (new renovations would cost "tens of millions of dollars"); Neff Decl. ¶ 6 ("Tyson's contract farmers will have to invest significant capital to reconfigure existing barns or construct new ones to meet Proposition 12's confinement standards.").

[12] Intervenors' expert focuses his analysis on confinement standards for chickens, which are not at issue in this lawsuit. *E.g.*, Ikizler Decl. ¶¶ 15, 20–21, 34–39. His central thrust is that Proposition 12 provides benefits to regulated parties because they can market their products from animals produced in compliance with Proposition 12 or other similar confinement standards. But to the extent there is a demand for such products in California and elsewhere, Proposition 12 did not create that demand and therefore provides no benefit to the Meat Institute's members. Indeed, the Meat Institute's members have organized their businesses to address consumer demands. *E.g.*, Bakke Decl. ¶¶ 4–7; Catelli Decl. ¶ 5; Friesen Decl. ¶ 4; Bollum Decl. ¶ 4; Darrell Decl. ¶¶ 8–9. Moreover, even if some regulated parties could mitigate a fraction of the costs imposed by Proposition 12, that would not undermine the conclusion that, absent a preliminary injunction, Proposition 12 will cause them irreparable harm. *E.g.*, Bakke Decl. ¶¶ 13–14; Catelli Decl. ¶¶ 9–10; Friesen Decl. ¶¶ 12–14; Bollum Decl. ¶¶ 5–10; Darrell Decl. ¶¶ 10–14; Neff Decl. ¶¶ 4–11; Rennells Decl. ¶¶ 9–14; Turner Decl. ¶¶ 7–15.

22

12 dictate that the sales provisions applying to pork products are more than two years away," Invrs. Br. 19, neither they nor defendants offer any substantive response to the Meat Institutes' showing that to be in a position to continue serving the California market in January 2022, pork suppliers would have to immediately begin the costly and time-consuming process of redesigning facilities and constructing new barn space, as well as persuading independent pig farmers who supply them to do the same, *see* Darrell Decl. ¶¶ 10–13; Neff Decl. ¶¶ 4–8; Rennells Decl. ¶¶ 9–13; Turner Decl. ¶¶ 7–12; Bollum Decl. ¶¶ 4–6.

As in *American Trucking Ass'ns*, these declarations confirm that regulated parties cannot "simply flip a switch" before the date on which these requirements come into effect; rather, they are "forced into making substantial changes commencing immediately." 559 F.3d at 1058. Indeed, as defendants acknowledge, with respect to Proposition 12's requirement that animals be permitted to "turn around freely," "in-state producers were given six years to come into compliance … when it was first introduced in Proposition 2." Defs. Br. 12. To the extent the "turn around freely" requirement applies *without* the six-year lead time given to in-state producers to come into compliance—which appears to be defendants' position, *id.* at 20 n.7—Proposition 12 presents the Meat Institute's members with imminent and irreparable harm. *See* NAMI Br. 24; Bollum Decl. ¶¶ 4–5; Darrell Decl. ¶¶ 9–10, 12–13; Neff Decl. ¶¶ 5–6; Rennells Decl. ¶¶ 9, 11; Turner Decl. ¶¶ 7, 10.

Finally, defendants and intervenors dismiss as speculative the record evidence that Meat Institute members may be driven, in whole or in part, from the California market and would suffer corresponding loss of goodwill within the California marketplace. Defs. Br. 19. There is nothing speculative about the harms imposed by Proposition 12. As the Meat Institute explained, Proposition 12 puts members to a Hobson's choice that requires them either to expend hundreds of millions of dollars to come into compliance or exit the California market. *See Am. Trucking Ass'ns*, 559 F.3d at 1057. As discussed above, members that incur multi-million dollar compliance costs will suffer irreparable harm because those costs "cannot be compensated" at the end of the litigation. *Id.* at 1058. Alternatively, members can avoid those costs only by being forced from the California market, *see id.*, thus

23

being denied the ability to generate revenue from one of the nation's largest and most important markets,[13] and suffering the loss of goodwill with their customers.[14] All of this is more than sufficient to establish irreparable harm.

## III. The Equities And The Public Interest Favor Preliminary Injunctive Relief.

Finally, the balance of the equities and the public interest strongly favor a preliminary injunction. Unless Proposition 12's sales ban is enjoined, the Meat Institute's members will suffer immediate and irreparable harm. *See supra* Part II. Contrary to defendants' position, the Meat Institute's showing of irreparable harm demonstrates concrete, substantial, and irreparable harm that will be suffered by thousands of farmers throughout the country.

Defendants argue that California has an interest in enforcing an initiative that reflects "the will of the people," Defs. Br. 20, but that argument ignores that "it is always in the

---

[13] *E.g.*, Darrell Decl. ¶ 15; Neff Decl. ¶ 12 ("Tyson would be harmed by losing millions of dollars in annual sales it makes into California."); Rennells Decl. ¶ 16 ("The cumulative net revenue financial impact of these outcomes to Clemens could be in excess of $150 million per year."); Bollum Decl. ¶ 11 ("If Hormel were driven from the California market, it would lose tens of millions of dollars in annual sales."); Catelli Decl. ¶ 10 ("[I]f Proposition 12 is not enjoined by January 1, 2020, Catelli Brothers will be forced to abandon the California market," "losing more than $3.5 million in annual veal sales in California"); Friesen Decl. ¶ 7 ("If Marcho Farms abandons the California market, it will lose the approximately $15 to $20 million in annual sales that it makes into California—nearly 20% of its business.").

[14] *E.g.*, Darrell Decl. ¶ 15 ("If Proposition 12 forces Smithfield out of California, customers, suppliers and farmers will look elsewhere"; "thousands of Smithfield employees in California could lose jobs and millions of California consumers would see more limited choices or increased prices, or both"); Neff Decl. ¶ 12 ("The forced exit from a major market such as California further would harm Tyson's relationships with its customers for whole pork products."); Rennells Decl. ¶ 16 ("[B]eing forced from the California market for products covered by Proposition 12 would inflict immediate and substantial damage to (i) Clemens' relationships with customers in California, (ii) Clemens' relationship with independent farmers with which it contracts to purchase hogs for processing by Clemens, (iii) Clemens' relationships with customers that purchase its whole pork products, and (iv) Clemens' goodwill within the marketplace."); Turner Decl. ¶ 17 (being forced from the California market would inflict damage on (i) "JBS USA's relationships with customers in California, who are likely to face shortages and higher costs necessary to ensure a consistent supply of California-compliant pork products," and (ii) "JBS USA's relationships with customers that purchase its whole pork products, who will be required to establish separate supply chains for California-bound pork"); Bollum Decl. ¶¶ 11–12 ("Hormel depends on brand recognition and consumer goodwill to win and retain customers. The disappearance of Hormel products from California would have a substantial effect on Hormel's relationships with its customers and its good will in the California market.").

public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Am. Trucking Ass'ns*, 559 F.3d at 1059–60 (highlighting "public interest" in adhering to the Constitution's requirements under the Supremacy Clause). It further ignores that "voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 295 (1981).

Lastly, defendants maintain that the "public interest" favors preserving Proposition 12's sales ban, but fail to identify what interest they seek to protect. Defs. Br. 20. The Meat Institute does not challenge confinement standards applicable to farms within California, or even applications of the sales ban to pork and veal produced in California, and California has no legitimate interest in banning the import of products as a means of controlling animal confinement standards in other States. *See Carbone*, 511 U.S. at 393 ("States … may not attach restrictions to … imports in order to control commerce in other States"); *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1882) ("No State can legislate except with reference to its own jurisdiction."); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996) ("[N]o single State [can] … impose its own policy choice on neighboring States."). In sum, the balance of equities and hardships tips sharply in the direction of a preliminary injunction.

## CONCLUSION

For these reasons, and those stated in the opening memorandum, the Meat Institute respectfully requests that the Court preliminarily enjoin enforcement of Proposition 12's unconstitutional sales ban.

Respectfully submitted,

DATED: November 4, 2019       SIDLEY AUSTIN LLP


*/s/ Sean A. Commons*
Paul J. Zidlicky (*pro hac vice*)
Eric D. McArthur (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Tel: (202) 736-8000

Fax: (202) 736-8711

Sean A. Commons, SBN 217603
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Tel: (213) 896-6000
Fax: (213) 896-6600

*Attorneys for Plaintiff*

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION